**UNITED STATES of America, Plaintiff-Appellee,**

v.

**George David BRANDT, et al., Norman Brown, III, et al., Defendants,**

**Joseph Thurman McAdams, et al., Defendants-Appellants.**

No. 82–5436.

United States Court of Appeals, Sixth Circuit.

Argued March 17, 1983.

Decided Sept. 15, 1983.

Richard L. Winchester, Jr. (argued), Winchester, Huggins, Charlton, Leake, Brown & Slater, Memphis, Tenn., for defendants-appellants.

W. Hickman Ewing, Jr., U.S. Atty., Michael Speros, Asst. U.S. Atty., Memphis, Tenn., S. Jonathan Blackmer, Lead Counsel (argued), Donald A. Carr, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before ENGEL and KRUPANSKY, Circuit Judges, and ALDRICH, District Judge.[*]

PER CURIAM.

This is an appeal from the United States District Court for the Western District of Tennessee in which the defendants-appellants challenge their convictions under the Migratory Bird Treaty Act (Act), 16 U.S.C. § 703 et seq.

The factual background of this controversy is not disputed. In September of 1978, two groups of hunters, the "Holt Group" and the "Brown Group", were served with citations charging them with violation of the Migratory Bird Treaty Act. The citations alleged that defendants had hunted doves on a "baited area" in the Western District of Tennessee in violation of a regulation promulgated by the Secretary of the Interior. The charges carried a maximum penalty of a $500 fine and six months imprisonment.

Defendants consented to trial before a United States Magistrate and trial of the Holt Group commenced on November 20, 1978. At the close of the Government's case in chief, the Magistrate dismissed the charges, concluding that the regulation which defendants were alleged to have violated, 50 C.F.R. § 20.21(i), was unconstitutionally vague. Thereafter, the Magistrate granted the Brown Group's pretrial motions to dismiss.

The government sought review of the rulings in the district court. The district court, upon consolidating the cases, overruled the Magistrate's determination that the regulation was unconstitutionally vague. The actions were thereupon remanded to the Magistrate. Trials were conducted and each defendant found guilty. The district court affirmed the convictions and this appeal ensued.

The Migratory Bird Treaty Act authorizes the Secretary of the Interior "to determine when, and to what extent, if at all, and by what means, it is compatible with the terms of the conventions [between the United States and several countries relating to the protection of migrating birds] to allow hunting ... of any such bird ... and to adopt suitable regulations permitting and governing the same ..." 16 U.S.C. § 704.[1] Pursuant to this authority, the Sec-

---

* The Hon. Ann Aldrich, District Judge for the Northern District of Ohio, sitting by designation.

1. The Supreme Court has recently commented: The protection of migratory birds has long been recognized as "a national interest of very nearly the first magnitude." *Missouri v. Holland,* 252 U.S. 416, 435, 40 S.Ct. 382, 384, 64 L.Ed. 641 (1920). Since the turn of the century, the Secretaries of Agriculture and of Interior successively have been charged with responsibility for "the preservation, distribution, introduction, and restoration of game birds and other wild birds." Act of May 25, 1900, 31 Stat. 187, 16 U.S.C. § 701. A series of treaties dating back to 1916 obligates the United States to preserve and protect migratory birds through the regulation of hunting, the establishment of refuges, and the protection of bird habitats.

retary promulgated 50 C.F.R. § 20.21, which provides, in pertinent part:

Migratory birds on which open seasons are prescribed in this part may be taken by any method except those prohibited in this section. No person shall take migratory game birds.

*    *    *    *    *    *

(i) By the aid of baiting, or on or over any baited area. As used in this paragraph, "baiting" shall mean the placing, exposing, depositing, distributing, or scattering of shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed so as to constitute for such birds a lure, attraction or enticement to, on, or over any areas where hunters are attempting to take them; and "baited area" means any area where shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed whatsoever capable of luring, attracting, or enticing such birds is directly or indirectly placed, exposed, deposited, distributed, or scattered; and such area shall remain a baited area for 10 days following complete removal of all such corn, wheat or other grain, salt, or other feed. However, nothing in this paragraph shall prohibit:

(1) The taking of all migratory game birds, including waterfowl, on or over standing crops, flooded standing crops (including aquatics), flooded harvested croplands, grain crops properly shocked on the field where grown, or grains found scattered solely as the result of normal agricultural planting or harvesting; and

(2) The taking of all migratory game birds, except waterfowl, on or over any lands where shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed has been distributed or scattered as the result of *bona fide* agricultural operations or procedures, or as a result of manipulation of a crop or other feed on the land where grown for wildlife management purposes: *Provided,* That manipulation for wildlife management purposes does not include the distributing or scattering of grain or other feed once it has been removed from or stored on the field where grown;

The appellants' sole contention on appeal is that the exceptions relating to "normal agricultural planting or harvesting" and "*bona fide* agricultural operations or procedures" are so vague that they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford* 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972).[2] Testimony adduced at trial did indicate that agricultural practices vary widely with respect to seeding of fields and thus appellants argue that it is impossible to determine what practices are considered "normal" or "*bona fide*".

However, this Court's construction of the regulation, as explained below, compels the conclusion that application of the exceptions in issue does not require a court or a hunter to engage in a technical inquiry to determine the boundaries of accepted agrarian practices. Rather, the pertinent probative inquiry should be directed to determining the intent of the person seeding the land.

A specific examination of the regulation elucidates this construction. First, the regulation seeks to preclude the taking of migratory birds which have been intentionally lured to an area by bait. However, migratory birds are also attracted to grain and other feed which is distributed in the ordinary course of farming activities. The Secretary apparently determined that the taking of migratory birds over areas to which the birds are attracted as a natural and ordinary consequence of agricultural practices is compatible with this country's obli-

---

*North Dakota v. United States,* —— U.S. ——, ——, 103 S.Ct. 1095, 1101, 75 L.Ed.2d 77 (1983).

**2.** The constitutional principles regarding vagueness apply to regulations as well as statutes, particularly where the regulations govern conduct and impose a criminal penalty. *See generally Diebold, Inc. v. Marshall,* 585 F.2d 1327, 1335–37 (6th Cir.1978).

gations under the various migratory bird treaties.

Accordingly, the Secretary provided that the taking of game birds over "grains found scattered as a result of normal agricultural planting or harvesting" is not prohibited. The Secretary's intent is not to distinguish between orthodox and unorthodox farming practices, but to distinguish between areas to which birds are attracted as a consequence of farming, and areas to which birds are intentionally lured by baiting.

There may be, as the testimony would indicate, many diverse methods for planting and harvesting, but, clearly, "normal agricultural planting or harvesting" has as its primary goal the growth and harvesting of a crop—not the enticement of migratory birds. Hence, the phrase "normal agricultural planting or harvesting" means planting or harvesting undertaken for the purpose of producing and gathering a crop.

Of course, a farmer may also be a hunter and, in engaging in agricultural activities, he would certainly realize, and perhaps even hope, that one of the results of his activities would be the enticement of birds. In such a case, the relevant inquiry would be whether the farmer's desire to attract birds caused him to initiate measures he would not otherwise have taken in the production of his crops.

A similar construction is appropriate for the phrase "*bona fide* agricultural operations or procedures." The term *bona fide* generally refers to good faith. *See,* Black's Law Dictionary, 233 (4th ed. 1968). In the context of this regulation an operation or procedure is undertaken in good faith if it is done for a purpose related to the growing of crops, for example, erosion control.

Thus, the crucial inquiry with respect to the exceptions in issue is the intent of the person seeding the field. There is nothing vague about this element. The intent of the person seeding the field is simply a fact to be proven as in any trial involving intent as an element of the offense.

This Circuit has held that scienter is not an element of an offense under the regulation. *United States v. Green,* 571 F.2d 1 (6th Cir.1977).[3] The hunter is therefore placed in a precarious position. He must determine the intent of the individual who seeded the area before undertaking the hunt and, if he errs in that determination, he is criminally responsible. A subjectively "innocent" person can unwittingly run afoul of the regulation. However, this is inherent in all so called "public welfare offenses" wherein scienter is not an element of the offense and these types of offenses have long been sanctioned by the courts.[4]

For example, in *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922), the defendants were charged under the Narcotic Act of 1914 with selling certain amounts of a derivative of opium and coca leaves. The defendants demurred to the indictment on the ground that it failed to charge that they knew the content of the drugs they sold. The district court quashed the indictment but, on appeal, the Supreme Court reversed.

The Supreme Court first observed generally:

> While the general rule at common law was that the scienter was a necessary element in the indictment and proof of every crime, and this was followed in regard to statutory crimes even where the statutory definition did not in terms include it (Rex v. Sleep, 8 Cox 472), there has been a modification of this view in respect to prosecutions under statutes the purpose of which would be obstructed by such a requirement. It is a question of legislative intent to be construed by the court. It has been objected that punish-

---

**3.** *Amicus curiae,* the National Rifle Association of America, asks this Court to retreat from *Green* and follow the Fifth Circuit case of *United States v. Delahoussaye,* 573 F.2d 910 (5th Cir.1978). For the reasons stated in *Green,* we decline to do so.

**4.** For an eloquent and instructive treatment of the evolution of such offenses, the famous case of *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) is recommended.

ment of a person for an act in violation of law when ignorant of the facts making it so, is an absence of due process of law. But that objection is considered and overruled in *Shevlin-Carpenter Co. v. Minnesota,* 218 U.S. 57, 69, 70, 30 Sup.Ct. 663, 666 (54 L.Ed. 930), in which it was held that in the prohibition or punishment of particular acts, the state may in the maintenance of a public policy provide "that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance."

*Id.* at 251–52, 42 S.Ct. at 302. With respect to the Narcotic Act, the Supreme Court ruled as follows:

It is very evident from a reading of [the Act] that the emphasis of the section is in securing a close supervision of the business of dealing in these dangerous drugs by the taxing officers of the Government and that it merely uses a criminal penalty to secure recorded evidence of the disposition of such drugs as a means of taxing and restraining the traffic. *Its manifest purpose is to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute, and if he sells the inhibited drug in ignorance of its character, to penalize him.*

*Id.* at 253–54, 42 S.Ct. at 302–03 (emphasis added).

So too, the Secretary's regulation requires a hunter to ascertain, at his peril, whether a field has been improperly baited.

In sum, the Court concludes that the regulation the defendants were charged with violating is not impermissibly vague and the defendants' contentions on appeal are without merit. Accordingly, the judgments of conviction must be and hereby are affirmed.

KRUPANSKY, Circuit Judge, dissenting.

While I agree with the majority's conclusion that the regulation here in issue is not unconstitutionally vague and therefore valid, I would not, on this record, affirm the convictions.

The crucial factual finding in prosecutions arising under the regulation in controversy is the intent of the individual seeding the field.

Although certain of the Magistrate's findings allude to the issue of intent, these findings were either modified or contradicted in subsequent sections of his report, thereby resulting in patent ambiguity and vagueness as to the operative facts. It is elementary that conviction of a crime, be it a misdemeanor or felony, demands proof of guilt beyond a reasonable doubt. Significantly absent from the Magistrate's report and recommendation to the district court is the articulation of a finding of fact, founded upon proof beyond a reasonable doubt, that the fields here in issue were intentionally baited for the sole purpose of attracting doves and were not seeded in accordance with "bona fide agricultural operations or procedures", a collateral effect of which *may* be an *unintentional* attraction for doves.

Accordingly, I would vacate the convictions in both actions and remand for new trials.