UNITED STATES of America,
Plaintiff–Appellee,

v.

Stephen S. BOYNTON; James R.
Booth; Bernard Dadds, Jr.,
Defendants–Appellants.

No. 94–5481.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 3, 1995.

Decided Aug. 28, 1995.

**ARGUED:** Stephen Slater Boynton, Vienna, VA, for appellants. Ethan L. Bauman, Asst. U.S. Atty., Baltimore, MD, for appellee. **ON BRIEF:** Lynne A. Battaglia, U.S. Atty., Baltimore, MD, for appellee.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Chief Judge ERVIN and Senior Judge PHILLIPS joined.

## OPINION

MURNAGHAN, Circuit Judge:

Defendants were convicted of hunting migratory birds over a baited area, a strict liability crime. Defendants admitted at a bench trial that they were hunting migratory birds over bait, but claimed that the grain which constituted the bait was scattered as the result of "normal agricultural planting or harvesting" or "*bona fide* agricultural operations and procedures" and thus that their hunting was lawful pursuant to the exceptions in the migratory bird hunting regulations for such situations. The magistrate judge conducting the bench trial decided that the scattered grain did not fall into either exception, and found the defendants guilty. The district court affirmed. Defendants now appeal. Finding no error in the convictions below, we affirm.

Hunting migratory birds over an area where seed or other bait is scattered is generally prohibited by the Migratory Bird Treaty Act ("MBTA"). 16 U.S.C. § 703 *et seq.; see also* 50 C.F.R. § 20.1 *et seq.* Two exceptions to this rule are set forth in a regulation promulgated by the Fish and Wildlife Service pursuant to the Act, 50 C.F.R. § 20.21(i), as follows:

> [N]othing in this paragraph shall prohibit:
> (1) The taking of all migratory game birds, including waterfowl, on or over . . . grains found scattered solely as the result of normal agricultural planting or harvesting; and
> (2) The taking of all migratory game birds, except waterfowl, on or over any lands where . . . wheat or other grain . . . has been distributed or scattered as the result of *bona fide* agricultural operations or procedures. . . .

A group of hunters were hunting mourning doves, which are migratory birds, on September 4, 1993, in Queen Anne's County, Maryland. They were hunting over an area which was, in effect, baited, by virtue of the presence of wheat seeds, a grain which attracts doves. The wheat seeds were "screenings," a term which refers to a mixture of low quality seeds and chaff. The screenings had been broadcast by means of a spreader, which left the grain scattered over the top of the soil without mixing it into the soil, in an approximately ninety-yard swath next to a slightly dried-up pond. The grain was located both above and below the usual water line, on dry ground which was parched due to a recent drought. Because the ground was

dry and the grain was not incorporated into the soil, the grain had not sprouted, despite the fact that it had been placed there approximately one month earlier. Agents from the United States Fish and Wildlife Service cited all of the hunters pursuant to 16 U.S.C. § 703 et seq. and 50 C.F.R. § 20.21(i), for hunting in a baited area. Three of the hunters—Stephen Boynton, James Booth, and Bernard Dadds, Jr.—challenged their citations and went to trial. These hunters, defendants in the instant case, concede the foregoing facts.

Evidence at trial conflicted as to whether the manner in which the grain was scattered was the result of "normal agricultural planting or harvesting" or "bona fide agricultural operations or procedures" as those terms are defined by farmers in the region, experts in agronomy, and the Fish and Wildlife Service. Evidence also conflicted as to the subjective intent of the farmer who spread the grain, Jay Quimby.

Jay Quimby claimed that his intent was to grow the wheat so that it would form a root system which would help retard leakage from the pond. He claimed that this had been his practice for six years, and that in normal rainfall years the grain had sprouted and helped retard the leakage. Jay Quimby stated that he had not "disced" the wheat under, i.e., incorporated the seeds into the soil, because discing would have increased the leakage. His father, Joseph Quimby, the owner of the land, said that he thought the grain had been placed there to feed some ducklings who had been living on the pond but were then eaten by raptors.

Jay Quimby stated that prior to the beginning of the hunt, the organizer of the hunt, Joseph Judge, had called and asked to use the pond area for hunting, but had not inquired about whether or not the area was "baited." Joseph Judge stated that when he called Quimby, he specifically asked if the area was baited, and Jay Quimby had said it was not. Judge also testified that he inspected the pond area and found no grain, and also admitted that he himself had been cited and fined for hunting in a baited area only one week prior to the Quimby farm hunt.

The pond had been constructed, in part, with public funds from the Queen Anne's County Soil Conservation Service ("SCS") to alleviate prior erosion. Jeffrey Opel of the SCS, who had extensive experience handling erosion control permits, testified that his inspection of the pond revealed no signs of leakage, and that a March 1993 SCS inspection did not report leakage. Opel also testified that the manner in which Quimby had spread the wheat at the pond was not a normal or recognized method of erosion control. Opel referred to an exhibit at trial, an SCS statement of standards for planting in eroding areas, which requires, among other things, seedbed preparation when the ground is dry so that the seed and soil will in fact mix. Quimby had not performed any seedbed preparation.

After the instant citations had been issued, Joseph Judge requested another SCS employee who had accompanied Opel in inspecting the pond, Joseph Haamid, to write a letter about the pond. Introduced as a government exhibit, that letter stated that planting seeds below a pond's waterline is not a normal stabilization (i.e., anti-erosion) practice. Later testimony at trial explained that when the water level comes up, the plants and roots will rot and will no longer perform any anti-erosion function. His letter also pointed out that SCS specifications for erosion or leakage control require seedbed preparation of some type. The letter stated that it is a "cultural practice" for some farmers to broadcast seed without any seedbed preparation, but that this requires a higher rate of application.

The government also introduced testimony of Ronald Mulford, an agronomist with experience in small grain, including wheat. He testified that putting wheat screenings on unprepared ground in the middle of summer without incorporating the seed into the soil was not a normal agricultural planting, and that wheat screenings planted in this manner could not be expected to grow. He testified that farmers sometimes use screenings to create a cover crop, but that when they do so, they incorporate the seed into the ground. He said that when the seed is not incorporated, it is not intended as a cover crop.

The government introduced a United States Fish and Wildlife Service pamphlet which states:

WHAT IS LEGAL

. . . .

Any grain in the field must be the result of a normal agricultural planting. . . . The agricultural planting must be done in a way which uses the normal planting methods in an area to produce an agricultural crop. Grain found in piles or in other large concentrations is not a normal agricultural planting. A normal agricultural planting includes many factors such as recommended planting dates, proper seed distribution, seed bed preparation, application rate, and seed vitality. . . .

The normal planting must be done for agricultural purposes. Planting wildlife food plots, planting a "dove field," or sowing seed for erosion control on a construction site are not agricultural purposes. Dove hunts are not legal over these areas.

. . . .

There are several agricultural operations or procedures other than planting or harvesting that scatter grain, salt, or feed. These activities also attract doves. The Latin words "bona fide," included in the hunting regulations mean in good faith or without fraud. A well-intentioned agricultural operation or procedure produces livestock or a crop. . . . Dove hunting is legal on these areas as long as these are "bona fide" agricultural operations or procedures.

The pamphlet was available from local Fish and Wildlife agents in September of 1993.

The defense introduced testimony of Bernard Dadds, Jr., one of the defendants, who had taken a one-day class in erosion and who testified that broadcasting seed was a method of erosion control. His father, Bernard Dadds, Sr., an experienced state natural resources police officer, testified that broadcasting a crop is a *bona fide* agricultural activity and that the method used around the Quimby pond was a normal agricultural activity.

The magistrate judge found as a matter of fact that the farmer who scattered the grain, Jay Quimby, did not have the intent to harvest the product of the grain, and concluded that the first regulatory exception, for "normal agricultural planting or harvesting," therefore was not met. The magistrate judge next stated, "I cannot find, as a matter of fact, that Jay Quimby's intent was to spread bait as the word is used." However, the magistrate judge decided as a matter of law that such intent was not determinative as to whether the scattering fell into the second regulatory exception, for "*bona fide* agricultural operations or procedures," and, viewing the facts surrounding the scattering objectively, determined that the scattered grain did not fall into the "*bona fide*" exception. The magistrate judge stated that there had to be some "mixing into the soil of the seed and not just laying [the screenings] on top" for the procedure to be *bona fide*. The magistrate judge found the defendants guilty and fined each of them $190 with a $10 special assessment. The defendants appealed to the district court.

The district court agreed with the magistrate judge's holding as a matter of law that planting when done without the intent to harvest is not included in "normal agricultural planting or harvesting." The district court also agreed with the magistrate judge that Jay Quimby's subjective intent in scattering the grain was not determinative on the question of whether the scattered grain was the result of normal planting or bona fide procedures. The district court affirmed the defendants' convictions in all respects because the evidence supported the factual finding by the magistrate judge that "the spreading of wheat screenings during a drought, without incorporation or other measures to insure germination, for the claimed purpose of stabilizing an erosion control pond was neither a 'normal' planting operation nor a bona fide agricultural operation or procedure." Defendants now appeal to this Court.

■ As noted above, the general prohibition on hunting migratory birds over an area where bait is scattered is subject to two exceptions, which are set forth in a regulation promulgated by the Fish and Wildlife Service pursuant to the MBTA. These exceptions permit hunting over grains "scat-

tered solely as the result of normal agricultural planting or harvesting" or "distributed or scattered as the result of *bona fide* agricultural operations or procedures." 50 C.F.R. § 20.21(i). The proper construction of the regulations is a matter of law, and therefore we review the construction placed on the regulations by the district court *de novo.* Although an agency's interpretation of its own regulations is entitled to deference from the courts, the interpretation will not be enforced if it is plainly erroneous or inconsistent with the regulation's language or the intent of the regulation as manifest by the agency at the time of the regulation's promulgation. *See, e.g., Thomas Jefferson University v. Shalala,* — U.S. —, —, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994); *Stinson v. United States,* — U.S. —, —, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993).

Defendants argue that "normal" and "*bona fide*" should be construed so as to require proof of the intent of the person who scattered the grain, as an element of the crime. Defendants argue that the definitions of the words "normal" and "*bona fide*" require that when the subjective intent of the person who scattered the grain was to engage in an agricultural planting, harvesting, operation or procedure, hunting over the grain falls within the exception. Thus, defendants argue that as a matter of law, the magistrate judge and district court erred in construing the regulation in a manner which permitted the defendants to be convicted without proof beyond a reasonable doubt that the person who scattered the grains did not have the intent to engage in an agricultural planting, harvesting, operation or procedure. Specifically, defendants argue that the government should have been required to prove that it was not the intent of Jay Quimby to engage in the agricultural procedure of soil erosion control. Further, the defendants argue that the evidence was insufficient to conclude that the procedure used by Quimby was not a subjectively "normal" and "*bona fide*" method of erosion control in the area.

On its face, the pamphlet issued by the Fish and Wildlife Service interpreting 50 C.F.R. § 20.21(i) does not support the defendants' interpretation of "normal agricultural planting or harvesting," but does support, to some extent, the defendants' interpretation of "*bona fide* agricultural operations or procedures." The Fish and Wildlife Service interprets the first exception to apply only to planting "done in a way which uses the normal planting methods in an area to produce a crop." The intent of the person who spread the grain is not determinative; rather, the inquiry asks only whether the grain is spread by means of the methods used in the area to produce a crop. Such an objective interpretation of the regulation is neither plainly erroneous nor inconsistent with the regulation. *See, e.g., Black's Law Dictionary* 1059 (defining "normal" as "[a]ccording to, constituting, or not deviating from an established norm ....") (6th ed. 1990).

In contrast, in its attempt to interpret the second exception for "*bona fide* agricultural operations or procedures" as applying if the procedures were performed with the intention to produce livestock or a crop,[1] the Fish and Wildlife Service pamphlet suggests that a subjective element is introduced into the regulatory scheme. The Fish and Wildlife Service pamphlet prepared for hunters interprets the exception as follows: "The Latin words 'bona fide,' included in the hunting regulations mean in good faith or without fraud." However, the Fish and Wildlife Service pamphlet itself is to some degree contradictory on this point, thereby introducing an ambiguity into the agency's interpretation of the regulation. After defining "bona fide,"

---

1. The district court rejected the government's argument that the operation or procedure must directly produce a crop in order to fall within the exception. The district court thus found that soil erosion control procedures could fall within the exception if they were performed with an agricultural purpose of indirectly aiding in the production of livestock and crops. The district court's interpretation was plainly correct, as the regulation would otherwise be redundant—the only operations or procedures which directly produce crops are planting and harvesting, which are already covered by the exception for "normal agricultural planting or harvesting." *See United States v. Brandt,* 717 F.2d 955, 958 (6th Cir.1983) ("In the context of this regulation an operation or procedure is undertaken in good faith if it is done for a purpose related to the growing of crops, for example, erosion control.").

the pamphlet states: "A well-intentioned agricultural operation or procedure produces livestock or a crop." An objective element is apparently introduced, in light of the fact that if the inquiry were purely subjective, a "bona fide" operation might or might not produce livestock or a crop; a well-intentioned operation engaged in by someone who knew nothing about farming might have no possibility of ever producing livestock or a crop. The pamphlet's wording indicates that such an operation, despite the subjective intentions of the person who scattered the grain, would not fall into the exception. Because the agency has interpreted its own regulations in an ambiguous manner, in order to determine whether the regulatory exception applies a subjective standard or an objective standard, we must resolve the ambiguity.

A review of the history and structure of the MBTA immediately reveals that a subjective interpretation of the regulation is plainly erroneous and inconsistent with the regulatory scheme for two reasons: First, such an interpretation would mark a radical shift in the regulatory scheme, yet no intent to so change the scheme was manifest by the Fish and Wildlife Service when it adopted the regulations containing the "bona fide" exception; second, such an interpretation would lead to the absurd result of requiring the prosecution to prove an intent element, when Congress intended that misdemeanor violations of the MBTA be regulatory, strict liability crimes.

■ Since the inception of the Migratory Bird Treaty in the early part of this century, misdemeanor violations of the MBTA, including hunting in a baited area, have been interpreted by the majority of the courts as strict liability crimes, not requiring the government to prove any intent element. See, e.g., United States v. Engler, 806 F.2d 425, 431 (3d Cir.1986), cert. denied, 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987); United States v. Chandler, 753 F.2d 360, 363 (4th Cir.1985); United States v. Brandt, 717 F.2d at 958–59; United States v. Jarman, 491 F.2d 764, 766 (4th Cir.1974); United States v. Wood, 437 F.2d 91, 91 (9th Cir.1971); Rogers v. United States, 367 F.2d 998, 1001 (8th

Cir.1966), cert. denied, 386 U.S. 943, 87 S.Ct. 976, 17 L.Ed.2d 874 (1967); see also United States v. FMC Corp., 572 F.2d 902, 906 (2d Cir.1978) (stating that cases have "consistently held" that the government need not prove a scienter element in cases of misdemeanor violations of the MBTA). As noted in a 1939 decision: "Congress deliberately omitted scienter as an essential ingredient of the minor offense [of violating the MBTA]. This concept is logical in light of the known practicality of the National Legislature in its enactments in support of the Migratory Bird Treaty." United States v. Reese, 27 F.Supp. 833, 835 (W.D.Tenn.1939). In 1986, Congress reiterated its continuing intent that misdemeanor violations of the MBTA are strict liability crimes. See S.Rep. No. 445, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 6113, 6128 ("Nothing in this amendment is intended to alter the 'strict liability' standard for misdemeanor prosecutions under 16 U.S.C. § 707(a), a standard which has been upheld in many Federal court decisions."). All circuits which have been faced with the question save one—the Fifth—have now held that the misdemeanor crimes created by the MBTA are strict liability crimes. See United States v. Garrett, 984 F.2d 1402, 1410 n.17 (5th Cir.1993) (noting that the Fifth Circuit's position, taken in United States v. Delahoussaye, 573 F.2d 910, 913 (5th Cir.1978), that violations of the MBTA require proof of scienter was "'[u]nique among the Circuits,'" United States v. Sylvester, 848 F.2d 520, 522 (5th Cir.1988), and contrary to the intent of a subsequent Congress).

■ Just as "Congress is presumed to enact legislation with knowledge of the law," United States v. Langley, 62 F.3d 602 (4th Cir.1995) (en banc), such that "'absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction,'" id. (quoting Estate of Wood v. C.I.R., 909 F.2d 1155, 1160 (8th Cir.1990)), administrative bodies may be presumed, absent a clear manifestation to the contrary, to have enacted regulations harmonious with the existing regulatory scheme. See also Ruckelshaus v. Sierra Club, 463

U.S. 680, 693–94, 103 S.Ct. 3274, 3282, 77 L.Ed.2d 938 (1983) (rejecting interpretation of statutory language which would result in "radical departure" from longstanding principles of law in the area, absent plain Congressional intent to the contrary). The Fish and Wildlife Service promulgated the regulations excepting hunting over a baited area where the bait has been scattered as the result of *bona fide* agricultural operations against a background of nearly consistent judicial interpretation of the crime of hunting over a baited area as a strict liability crime. The Fish and Wildlife Service manifested no intent to change the existing regulatory scheme in such a fundamental way as to require the prosecution to prove an intent element. *See* 38 Fed.Reg. 22015, 22022 (Aug. 15, 1973). In order to conclude that the regulation was intended to change the established principle that the prosecution need not prove any element of intent to show a violation of the MBTA, a clear showing that the responsible agency intended such a change is required. *Cf. Ruckelshaus,* 463 U.S. at 685, 103 S.Ct. at 3277–78 ("Before we will conclude Congress abandoned [an] established principle . . . a clear showing that this result was intended is required.").

■ We find no clear showing of intent by the Fish and Wildlife Service to change the basic feature of the MBTA that no evidence of intent is required to prove a misdemeanor violation of the Act. Rather, the more logical reading of the regulatory language in context, is that hunting over grain scattered as the result of any one of the number of possible methods accepted in the community for performing an agricultural operation is legal, but hunting over grain scattered as the result of a method which is not accepted as an agricultural method in the community is not.

■ Furthermore, an interpretation requiring proof of the subjective intent of the person who scattered the grain would stymie enforcement of the MBTA. Just as we are permitted "some 'scope for adopting a restricted rather than a literal or usual meaning of [a statute's] words where acceptance of that meaning . . . would thwart the obvious purpose of the statute,'" *Commissioner v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 1166,

14 L.Ed.2d 75 (1965) (quoting *Helvering v. Hammel,* 311 U.S. 504, 510–11, 61 S.Ct. 368, 371–72, 85 L.Ed. 303 (1941)), so too we may adopt a restricted rather than a literal reading of the words in a regulation when the literal meaning would thwart the purpose of the regulation, and the agency responsible for administering the regulation has not clearly stated which interpretation it adopts. And just as "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available," *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982) (citing *United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 542–43, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *Haggar Co. v. Helvering,* 308 U.S. 389, 394, 60 S.Ct. 337, 340, 84 L.Ed. 340 (1940)), so too interpretations of a regulation which would produce absurd results may be avoided by adopting an alternative interpretation consistent with the regulation's purpose.

■ Bearing in mind that each defendant was fined $200, an interpretation of the regulations which would create a requirement that the government must prove the intent of the person who scattered the grain in order to prosecute successfully is absurd, and thwarts the purpose of Congress in creating a strict liability crime for hunting over a baited area. As noted in another 1939 opinion:

> [I]t was not the intention of Congress to require any guilty knowledge or intent to complete the commission of the offense, and . . . accordingly scienter is not necessary. The beneficial purpose of the [Migratory Bird] treaty and the act would be largely nullified if it was necessary on the part of the government to prove the existence of scienter on the part of defendants accused of violating the provisions of the act.

*United States v. Schultze,* 28 F.Supp. 234, 236 (W.D.Ky.1939). To require the government to prove the intent of the person who scattered the grain in every case charging a misdemeanor violation of the MBTA would produce the absurd result, clearly not con-

templated by Congress, of nullifying the ease of prosecution created by the designation of hunting over a baited area as a strict liability crime. The person who scattered the grain would have to be subpoenaed and questioned, along with corroborating witnesses, thus placing a burden on the prosecution and on third parties not even charged. As explained by the Supreme Court in reference to strict liability crimes generally:

> While the general rule at common law was that the *scienter* was a necessary element in the indictment and proof of every crime, ... there has been a modification of this view in respect to prosecutions under statutes the purpose of which would be obstructed by such a requirement. It is a question of legislative intent to be construed by the court.

*United States v. Balint,* 258 U.S. 250, 251, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922). Therefore, we do not adopt the reading of the statute suggested by the defendants, and instead hold that the exceptions for "normal" planting and *"bona fide"* procedures both refer to an objective measure of the agricultural practices of the community.

The only reported case to have considered explicitly whether the standards for application of the "normal" and *"bona fide"* exceptions should be objective or subjective is one decided by the Sixth Circuit, *United States v. Brandt,* 717 F.2d 955 (6th Cir.1983).[2] In *Brandt,* the Sixth Circuit faced a constitutional challenge to the regulatory exceptions as void for vagueness. The Sixth Circuit concluded that the regulations were not unconstitutionally vague because "the crucial inquiry with respect to the exceptions in issue is the intent of the person seeding the field [and t]here is nothing vague about this element." *Brandt,* 717 F.2d at 958. We

decline to follow the Sixth Circuit's adoption of a subjective measure of the grain scatterer's intent as the standard to determine whether the planting or operation is "normal" or *"bona fide."* We note also that our interpretation of the regulations does not render them unconstitutionally vague, as hunters may discover the agricultural practices of the community by inquiry with the Fish and Wildlife Service prior to commencing the hunt. Such an inquiry promises to be even more reliable and useful to the hunter attempting to avoid strict liability than would be an inquiry into the intent of the person who scattered the grain as was suggested by the Sixth Circuit, in light of the fact that the person who scattered the grain has no duty to represent honestly his or her intent to hunters, and may not be available to hunters for consultation. In the instant case, for example, Jay Quimby had no reason to explain accurately why he had scattered the grain to Joseph Judge when Judge called Quimby. On the other hand, if Judge had called the Fish and Wildlife Service, the agents, in their duty to uphold the MBTA, would certainly have told him that throwing screenings on the ground around a pond is neither a normal planting nor a *bona fide* agricultural method.

■ We now turn to the defendants' contention that the evidence was insufficient to support the district court's finding that Jay Quimby's spreading of screenings was not the "normal" and *"bona fide"* practice in the area. Because the proper standard is an objective rather than subjective one, the defendants' attack on the sufficiency of the evidence of intent does not provide a basis for challenging the convictions. Reviewing the sufficiency of the evidence under the

**2.** The only other reported case which discusses "bona fide agricultural operations or procedures," *United States v. Sylvester,* 848 F.2d 520 (5th Cir.1988), does not state whether the court was relying on an objective measure or a subjective measure to decide whether the practice was "bona fide." In *Sylvester,* the facts were as follows: large quantities of moldy grain, unfit even for cover crop germination, were spread during the 48 hours immediately preceding the opening of hunting season. *Sylvester,* 848 F.2d at 522. On those facts, the court may have concluded

that it was objectively not an agricultural operation or procedure to scatter the grain in that manner, *or* this objective fact may have been circumstantial evidence used by the court to find that the intent of the person who scattered the grain in this manner was not to engage in an agricultural operation. The *Sylvester* opinion, therefore, while not providing clear authority for either an objective or a subjective construction of the regulatory language, reached a conclusion consistent with a view that the statute should be read objectively.

proper objective standard, we find that the evidence was sufficient to convict.

■ We review a criminal conviction for sufficiency of the evidence by asking whether any rational trier of fact, taking the evidence in the light most favorable to the government, could have found all of the elements necessary for conviction beyond a reasonable doubt. *E.g.*, *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The government presented evidence of objectively normal and *bona fide* agricultural practices in the community through the testimony of an agronomy expert, a soil erosion control expert, and a pamphlet of the Fish and Wildlife Service. The defense presented evidence of objective agricultural norms in the community through the testimony of Bernard Dadds, Jr. and his father, Bernard Dadds, Sr., an experienced state natural resources police officer. The factfinder here, the magistrate judge, was faced both with evidence that the manner in which Jay Quimby had spread the wheat was not "normal" or *"bona fide"* according to objective agricultural standards, and with evidence that the manner in which Quimby spread the wheat was "normal" and *"bona fide"* according to objective standards. On appeal, however, the evidence must be viewed in the light most favorable to the conviction. *E.g.*, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942); *United States v. Ireland*, 493 F.2d 1208, 1208 (4th Cir.1973). Here, there was sufficient evidence from which a reasonable trier of fact could have found that the wheat broadcasting at issue was not an objectively normal and *bona fide* agricultural practice of the area, because evidence was presented that screenings thrown on dry parched ground cannot be expected to grow, and that if they had grown, the plants produced would not have prevented erosion. Thus, we find that the evidence was sufficient to support the convictions.

*AFFIRMED.*