**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 98-30719

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JERRY ARVILLE ADAMS, JR.,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Louisiana

May 3, 1999

Before DAVIS, STEWART, and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Appellant Jerry Arville Adams ("Adams") appeals his conviction on two counts of violating the Migratory Bird Treaty Act ("MBTA") for taking doves with the aid of bait and aiding and abetting others in taking doves with the aid of bait.[1] *See* 16 U.S.C. § 703; 18 U.S.C. § 2;  50 C.F.R. § 20.21(i).  In support of his appeal,

---

[1]He was also convicted on one count of possessing a live dove in violation of 50 C.F.R. § 20.38, but does not challenge it on appeal.

1

Adams argues that: (1) 16 U.S.C. § 703, as further defined by 50 C.F.R. § 20.21(i), is unconstitutionally vague as applied to him in this case, (2) the Magistrate Judge erred in determining that intent is not an element of the offense for which he was convicted, (3) the Magistrate Judge erred in allowing a certain witness to testify as an expert, (4) the Magistrate Judge erred in finding that his method of planting winter wheat for grazing cattle was not a "normal agricultural planting," (5) the Magistrate Judge erred in finding that his method was not a "bona fide agricultural operation or procedure," (6) the Magistrate Judge erred in relying on an LSU Agricultural Extension Service manual on optimum-yield planting dates to determine that he was hunting over a baited field as a matter of law, and (7) the Magistrate Judge erred in not allowing him to introduce evidence on the procedures commonly used to plant winter wheat in his area. After careful review, we reverse Adams's conviction.

## I. FACTS AND PROCEDURAL BACKGROUND

The material facts of this case are not disputed among the parties. During the last week in August, 1997, defendant Adams prepared a field of approximately 18-19 acres in Northeast Louisiana for the planting of winter wheat to graze his cattle on during the upcoming winter. Adams prepared the field at the instruction of his father, who had farmed all his life and who customarily planted the winter wheat field in late August. Adams disked the field, fertilized the field, scattered 33 bags of wheat across the field with a spreader in the customary manner and when his spreader broke, he scattered two remaining bags of wheat across

2

the field "as uniformly as possible." Because of this, the Wildlife agents investigating the field noted that certain areas of the field had higher concentrations of grain than others. Despite the uneven distribution, the eventual result was a lush and uniform field of winter wheat.

On September 6, 1997, Adams, his wife, his father-in-law and his brother-in-law went out to dove hunt on the field. Adams shot 12 doves that day, and the other parties also shot birds. Later during the hunt, Adams and his hunting party were approached by Federal and Louisiana State Wildlife agents. The agents checked their licenses, counted their birds, and made an inspection of the field at which time they discovered the grain. Also during this inspection, a dove from Adam's game bag took off and flew away after being removed from his bag. Apparently, Adams thought the bird was dead after he had knocked it to the ground with a shot. On the basis of this bird, the agents charged Adams with possession of a live dove in violation of 50 C.F.R. § 20.38.

In addition to being charged with possession of a live dove, Adams was also charged with taking doves with the aid of bait and aiding and abetting others in taking doves with the aid of bait. Trial was held before a magistrate judge, where special agent Kash Schriefer of the U.S. Fish and Wildlife Service and county agent John Barnett both testified that the recommended earliest wheat-planting date was September 20. Based on an LSU Extension Service pamphlet, Barnett testified that planting wheat prior to September 20 was not a "normal agricultural planting." In support of his contention that his activities fell under at least one of the two

3

exceptions contained in the statute, Adams sought to introduce certain demonstrative evidence and testimony of other farmers that Adams's planting was in accordance with the common procedures used in the area. The Magistrate Judge did not allow Adams to introduce the evidence and found him guilty on all three counts. Adams was sentenced to pay a fine totaling $1750 plus a $30 assessment and placed on one year supervised probation with the condition that he cannot hunt, go to hunting camps, or carry a firearm along with the standard conditions of probation. Adams appealed to the district court which affirmed his conviction, substantially adopting the findings of the Magistrate Judge. This appeal followed.

## II. DISCUSSION

Adams first challenges 50 C.F.R. § 20.21(i) as being unconstitutionally vague as it was applied to him. The relevant portions of the regulation provide:

No person shall take migratory game birds:

* * *

(i) By the aid of baiting, or on or over any baited area.... However, nothing in this paragraph shall prohibit:
(1) The taking of all migratory game birds, including waterfowl, on or over standing crops (including aquatics), flooded harvested croplands, grain crops properly shocked on the field where grown, or grains found scattered solely *as the result of normal agricultural planting or harvesting;* and
(2) The taking of all migratory game birds, except waterfowl, on or over any lands where shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed has been distributed or scattered *as the result of bona fide agricultural operations or procedures....*

50 C.F.R. § 20.21(i) (emphasis added). Rather than decide this

4

constitutional question, we resolve this case on other grounds.[2] *See generally Acorn v. Edwards*, 81 F.3d 1387, 1390 (5th Cir.1996)(noting that federal courts have a duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration). Like the flush of a convey of quail, a number of reversible issues materialize in this appeal.

In Adams's first non-constitutional challenge, he contends that the Magistrate Judge erred in determining that intent is not an element of the offense for which he was convicted. Because of this ruling, Adams was not allowed to fully develop evidence showing that his planting methods were commonly used in the area and that his intentions were to grow the best possible stand of winter wheat that he could. Accepting an LSU Agricultural Extension pamphlet as conclusive proof on the matter, the Magistrate Judge found that Adams was hunting over bait as a matter of law because he had planted the wheat prior to the optimal planting date of September 20. In addition to not letting Adams put on evidence to show that his planting was "normal," neither the Government nor the two lower courts sufficiently addressed whether Adams's planting was a "bona fide" agricultural operation or procedure.

Two cases from other circuits interpreting the § 20.21(i)

---

[2]The two reported circuit-level cases that have considered this specific question have both concluded that the two exceptions contained in § 20.21(i) are not unconstitutionally vague. *See United States v. Boynton*, 63 F.3d 337, 345 (4th Cir.1995); *United States v. Brandt*, 717 F.2d 955, 959 (6th Cir.1983).

exceptions have come to different conclusions on whether the tests for compliance should be objective, with no regard to the defendant's level of intent or knowledge, or subjective, with the intent of the person that spread the grain determining whether a violation had occurred. It should be noted, however, that both circuits in which these cases were decided adhere to a strict liability view of the MBTA.

In *United States v. Brandt*, the Sixth Circuit considered a vagueness challenge to the exceptions by dove hunters similar to Adams that had been convicted of hunting over a baited field. 717 F.2d 955 (6th Cir.1983). The court noted that the taking of migratory birds over areas where they are attracted as a natural and ordinary consequence of agricultural practices is clearly contemplated as acceptable under the statute. Further, "[t]he statute only seeks to preclude the taking of migratory birds which have been intentionally lured to an area by bait." *Id.* at 957. Because of this, the court concluded, "[t]he Secretary's intent is not to distinguish between orthodox and unorthodox farming practices, but to distinguish between areas to which birds are attracted as a consequence of farming, and areas to which birds are intentionally lured by baiting." *Id.* at 958. Therefore, the Sixth Circuit held that the exceptions did not require a hunter to engage in a complex inquiry to determine the confines of customary agrarian practices, but rather the inquiry should be a subjective interpretation "directed at determining the intent of the person seeding the land." *Id.* at 957.

Under this approach, the *Brandt* Court maintains that it has

6

not changed the Sixth Circuit's strict liability view of the Act. Regardless of the hunter's intent or knowledge of the bait, the hunter could still be convicted depending on the intent of the person spreading the grain. "In such a case, the relevant inquiry would be whether the farmer's desire to attract birds caused him to initiate measures he would not otherwise have taken in the production of his crops." *Id.* at 958. Under this test, the hunter must ascertain, at his own peril, whether the field has been improperly baited. The court in *Brandt* affirmed the defendant's conviction, holding that "the intent of the person seeding the field is simply a fact to be proven as in any trial involving intent as an element of the offense." *Id.*

The same issue arose again twelve years later in *United States v. Boynton*, but contrary to the holding in *Brandt*, the Fourth Circuit used an objective standard to determine the applicability of the two exceptions. 63 F.3d 337 (4th Cir.1995). In regard to the "normal agricultural planting or harvesting" exception, the court held that the intent of the person who spread the grain is not determinative, but rather, the inquiry should ask only whether the grain was spread in a method accepted in the community to produce a crop. *See id.* at 344. As to "bona fide agricultural operations or procedures," the court concluded that to force the government to prove an intent element, when Congress intended misdemeanor violations of the MBTA to be regulatory, strict liability crimes would be an "absurd result." *See id.* In light of the majority of Federal Circuits interpreting the MBTA as a strict liability offense along with no indication by the Fish and Wildlife Service to make such a "radical" change as adding an intent element

to the regulations, the court concluded that a purely objective test for both exceptions should be used. *See id.* at 345. The Fourth Circuit's test thus states that, "hunting over grain scattered as the result of any one of the number of possible methods accepted in the community for performing an agricultural operation is legal, but hunting over grain scattered as a result of a method which is not accepted as an agricultural method in the community is not." *Id.* at 344. The district court's opinion cites *Boynton* and holds that the intent of the person spreading the grain has no affect on the inquiry. However, much of the rationale in *Boynton* stems from the Fourth Circuit's strict liability view of the MBTA. According to the district court in this case, "once it has been shown that the hunter has something to do, directly or indirectly, with the placing of bait, the hunter hunts at his own peril." *See Yandell v. U.S. By and Through Dept. of Interior*, 550 F.Supp. 572, 577 (N.D. Miss.1982). The district court's adoption of a strict liability view of the MBTA is inconsistent with Fifth Circuit precedent. "Unique among the circuits, we require a minimum level of scienter as a necessary element of an offense of the MBTA." *United States v. Sylvester*, 848 F.2d 520, 522 (5th Cir.1988)(referring to the standard set forth in the earlier Fifth Circuit case of *United States v. Delahoussaye*, 573 F.2d 910 (5th Cir.1978). In *Delahoussaye*, we held that for a hunter to be convicted of a baiting violation under the MBTA, there must be a finding that the hunter at least "should have known" that the birds were being influenced by the presence of bait. *See* 573 F.2d at 913. Although the precise issue raised in *Delahoussaye* was not at issue in this case, the simple fact that we do not adhere to a

8

strict liability view of the act suggests that the district court's reliance on *Boynton* was misplaced. However, rather than end the inquiry with *Delahoussaye* and § 20.21 generally, we must now consider whether intent is relevant specifically to the exceptions of § 20.21(i). The Government contends that a purely objective test should be used for both exceptions, while Adams contends that the subjective element of the planter's intent should be relevant to the inquiry.

We first agree that an objective test should be used to determine if an activity constitutes a "normal agricultural planting or harvesting" under § 20.21(i)(1). Under such a test, an activity will be deemed "normal" if it could be thought consistent with the commonly accepted methods used in the area to produce a crop. Normal area planting dates, seed distribution, seed bed preparation, application rates, seed vitality, and eventual yields and results, among others, are factors to consider in determining if a method is accepted in the area. Unlike the approach taken in the magistrate court below, a defendant will be able to introduce relevant evidence he may have tending to show that the field was prepared in a locally accepted manner.

In regard to the second exception, whether the bait was scattered as the result of "bona fide agricultural operations or procedures" under § 20.21(i)(2), the better reasoned view is that the subjective intent of the person planting the field should be considered in light of the objective agricultural norms used in the area. This standard introduces both subjective and objective elements into the inquiry. The Latin words "bona fide" included in the hunting regulations mean "in good faith" or "without fraud."

9

*See* BLACK'S LAW DICTIONARY, 177 (6th ed. 1990); *Brandt*, 717 F.2d at 958; *Boynton*, 63 F.3d at 341. Like the Sixth Circuit in *Brandt*, the subjective prong of the test we adopt is not a mens rea standard. It looks at the intent of the person scattering the grain, not the intent of the hunter.[3] In other words, it does not incorporate a scienter requirement in addition to this circuit's *Delahoussaye* "should have known" standard; it simply recognizes that the language of the exception requires an inquiry into the intent of the planter to determine whether the activity in question was conducted pursuant to a "bona fide agricultural operation or procedure." This approach maintains fidelity to the common understanding of "bona fide" as meaning "good faith." Neither the government in this case nor the Fourth Circuit in *Boynton* argued that "bona fide" should be given any other meaning than "good faith." It is therefore difficult to square the Fourth Circuit's purely objective test with the plain language of the regulation.

We thus hold that part of the inquiry into whether an act is "bona fide" or not requires the government to prove that the spreader's intentions were not in good faith. Stated another way, the government must prove, "as in any other case where intent is an element of the offense," that the farmer's acts were merely a sham to attract migratory birds to hunt. *See generally Brandt*, 717 F.2d at 958.

In attempting to distinguish "bona fide operations and procedures" from Adams's activities in the present case, the

_____

[3]Except, of course, in the situation like the present case where the spreader and the hunter are one and the same.

10

Government points to language in *Brandt* that "an operation or procedure is undertaken in good faith if it is done for a purpose related to the growing of crops, for example, erosion control." 717 F.2d at 958. The Government argues that this language distinguishes actual planting (which is what Adams was doing) from activity *related* to actual planting (such as erosion control). This interpretation, however, essentially reads the words "bona fide" out of the regulation. At best, the Government treats "bona fide" as synonymous with "normal" and argues that the only real distinction between the two exceptions is the distinction between "planting" on the one hand and "operations or procedures" on the other. In accepting the Government's position, the district court reasoned that to hold otherwise would render the two exceptions redundant. Yet to construe "operations or procedures" as excluding actual planting, as the Government proposes, would have the perverse result of protecting good faith activities *related* to planting while leaving *actual* good faith planting unprotected. Indeed, there are many agricultural operations or procedures besides those involving "planting or harvesting." In those instances, the "normal agricultural planting and harvesting" exception, by its very terms, cannot apply. *See United States v. Manning*, 787 F.2d 431, 436 (8th Cir.1986). However, planting and harvesting are by definition agricultural operations and procedures. We therefore find no reason why a planting or harvesting cannot be analyzed under each exception in § 20.21(i).

By treating the LSU Extension Service's recommended optimal planting dates as determinative on the question of *both* the agricultural practices of the community *and* Adams's own subjective

11

good faith, the Magistrate Judge and district court left Adams without a reasonable opportunity to steer between lawful and unlawful conduct. A reasonable person might well inquire with the Fish and Wildlife Service to determine what planting practices are considered "normal" within the area, but a reasonable person cannot be expected to seek outside counsel on the question of his own intentions. While Adams's failure to comply with the LSU Extension Service's date recommendation may hypothetically indicate a lack of good faith on his part, Adams was at least entitled to have the courts below consider the evidence of his good faith in growing the wheat.

The Government also contends that the "bona fide agricultural operation or procedure" exception was never raised at the trial level. However, the record is clear that Adams repeatedly addressed this issue. Regardless, the Government's argument is based on the assumption that the two exceptions are affirmative defenses rather than elements of the offense itself. Nothing in the text of the regulation supports this interpretation. Indeed, the regulation expressly states that "nothing in this paragraph shall prohibit" hunting under either of the two exceptions. 50 C.F.R. § 20.21(i). The language is flatly inconsistent with the contention that the exceptions are affirmative defenses rather than elements of the crime itself. The regulation indicates by its own language that its prohibition does not extend to the two circumstances set forth in the exceptions. The onus is therefore on the Government to prove that neither circumstance existed in the present case.

Adams next asserts that, regardless of whether an objective or

12

subjective test is used, the district court erred in finding that his activities did not fall under the two exceptions.  Directly challenging the sufficiency of the evidence to support the trial court's ultimate findings, Adams maintains that the court erroneously believed that hunting over a field that was planted before the recommended planting date would be a violation of the regulation regardless of whether the field was planted as an otherwise "normal agricultural planting" or "bona fide agricultural operation or procedure."  This notion caused the judge to exclude from evidence testimony by other area cattle farmers as to their normal agricultural planting operations, to exclude photographs of the field in question showing a uniform lush stand of winter wheat resulting from the methods utilized, to exclude evidence of planting dates used by other area cattle farmers in Northeast Louisiana and to exclude evidence of other factors farmers consider for planting such as weather, anticipated rainfall and the farmer's desire for an early or late crop.

The Magistrate Judge was of the opinion that the practices utilized by the defendant may have been perfectly fine for farming purposes but were not considered "normal" for purposes of hunting over planted fields.  In other words, what is "normal" and "bona fide" for farming is not the same thing as "normal" and "bona fide" for hunting.  For hunting purposes, the only relevant inquiry was whether it was planted prior to September 20.

The standard of review for a finding of guilt at a bench trial is whether the conviction is supported by substantial evidence. *See United States v. Cardenas*, 9 F.3d 1139, 1156 (5th Cir.1993). To reverse such a conviction, we must conclude that no rational

13

trier of fact could find substantial evidence indicating the defendant's guilt beyond a reasonable doubt after viewing the evidence in the light most favorable to the Government. *See United States v. Garcia*, 135 F.3d 951, 955 (5th Cir.1998).

Under the correct legal standard that considers evidence of Adams's subjective intent, as well as Adams's proffered evidence showing conformity to the accepted practices in the area, we believe that no rational trier of fact could support the conviction. Both courts below accepted as conclusive proof that any planting before September 20 was baiting regardless of evidence that it was done in complete conformance with the agricultural norms of the area. According to the district court, it upheld the Magistrate Judge's refusal to allow Adams to introduce evidence because to do otherwise would have been a "waste of time or a needless presentation of cumulative evidence" under Federal Rule of Evidence 403. *See* FED. R. CIV. EVID. 403. We disagree. The additional evidence Adams sought to present went directly to whether a violation of the statute occurred or not.

Adams planted his winter wheat the same time of year each year the same way his father had done all his farming life. As part of their livelihood, Adams's family planted their winter wheat at the time they felt would best ensure their cattle enough forage to make it through the winter. The Government does not dispute that the eventual result of Adams's planting was a uniform lush field of winter wheat. Adams was also paid by others in the area to do their planting because they knew his methods would produce good results. He disked the field, fertilized the field, scattered 33 bags with a spreader, and when the spreader broke, he scattered the

14

two remaining bags with the aid of his truck. Requiring Adams to wait for his spreader to be repaired to have his planting considered normal is not required under the facts of this case.

The Government's star piece of evidence was the LSU Extension Service pamphlet setting out September 20 as the recommended earliest planting date for optimal production of winter wheat.[4] This pamphlet is evidence that could be considered to determine if Adams's planting was normal. However, the opinions therein do not conclude the issue as a matter of law. It is just one piece of evidence to be weighed in determining if the planting was normal. Nowhere in the record has there been properly developed any showing that this informational pamphlet should have the force of law or deserve the deference of an official agency interpretation of its own regulations. We thus conclude that the court's exclusive reliance on this pamphlet as determinative of the issue was error. This error would normally result in a remand for a new trial. However, the need for a new trial has been obviated by our determination as set forth below.

The LSU pamphlet and testimony thereon, along with the fact that certain areas of the field had higher concentrations of grain than others, precludes us from granting Adams an acquittal based on the "normal agricultural planting" exception. We cannot say that no rational trier of fact could find beyond a reasonable doubt that Adams's planting was not "normal." *See generally Garcia*, 135 F.3d

---

[4]It is not entirely clear from the record if the pamphlet was actually admitted into evidence, or just referred to by the Government's witnesses. It is undisputed, however, that Adams had no knowledge of the pamphlet prior to hunting over his field.

at 955.

On the other hand, the Government has failed to sufficiently address and prove that Adams's field was not planted as the result of a "bona fide agricultural operation or procedure." This point was apparently lost in the lower court's determination that intent played no role in the inquiry. There is no dispute that Adams planted his field first and foremost with the good faith intention of providing a source of food for his cattle during the upcoming winter. It is also uncontested that Adams distributed the wheat seed during his planting and knew of its presence while hunting there. However, nothing in the briefs or the record suggests that the Government introduced or attempted to introduce evidence that Adams acted other than in good faith in planting his field. In fact, both the Magistrate Judge and the Government admitted that they did not question Adams's good faith intentions for planting the crop. In the words of *Brandt*, Adams's desire to attract birds did not cause him to initiate measures he would not otherwise have taken in the production of his crops. *See Brandt*, 717 F.2d at 958. Therefore, in light of Adams's subjective good faith and objective compliance with the agricultural norms of the area, and because there is no evidence from which a rational trier of fact could find that Adams's planting was not the result of a "bona fide agricultural operation or procedure," we reverse Adams's conviction and render acquittal on both counts.

### III. CONCLUSION

For the foregoing reasons, we REVERSE Adams's convictions on count one for taking doves with the aid of bait and count two for aiding and abetting others in taking doves with the aid of bait,

16

and RENDER acquittal on these counts, and REMAND for the limited purpose of re-sentencing Adams on count three for unlawfully possessing a live dove.