REVISED, July 25, 2000

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 99-60333

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HARRY LEE; DANNY J. RUSSO; JEFFREY
BARNES; DWIGHT BLACKWELL; MICHAEL
BLACKWELL; ALFRED L. FELDER, JR.;
PETER J. HAHN; JOHN C. FELDER, JR.; JAN
H. BARNES; STEVEN V. SLATON; ALFRED
FELDER; and JACK BASS,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Mississippi

---

June 26, 2000

Before POLITZ and DAVIS, Circuit Judges, and RESTANI,* Judge.

DAVIS, Circuit Judge:

Eleven of the twelve appellants were convicted of hunting over a baited field in violation of 16 U.S.C. §§ 703 and 707(a) and 50 C.F.R. § 20.21(I).  Jack Bass was convicted of aiding and abetting his co-defendants in hunting over a baited field.  For the reasons assigned, we affirm all convictions.

I.

---

* Judge of the United States Court of International Trade, sitting by designation.

On September 20, 1997, the opening day of that year's dove hunting season, a dove hunt was held on property leased by defendant Jack Bass in Pike County, Mississippi. After purchasing the requisite hunting licenses, the defendants and others met near the leased property, introduced themselves, and engaged in idle conversation for about an hour and a half. During the afternoon, most of the hunters entered the leased acreage from the side near the road where they had parked their vehicles. Several of the men noticed a substantial amount of wheat seed scattered on the freshly harrowed land and promptly asked Bass whether it was legal to hunt over the wheat seed. Bass assured them that the wheat had been distributed strictly according to accepted agricultural practices and was legal.[1]

The leased property consisted of 50 acres near the Bogue Chitto River and had been leased by Bass for the purpose of growing vegetables. The western border of the property is in a straight line measuring approximately 690 yards. The southern border, also in a straight line, is approximately 430 yards and intersects the western border at a right angle. The eastern border extends

---

[1]The regulation prohibiting the taking of migratory game birds over a baited area then provided an exception for birds, except waterfowl, taken:

on or over lands where shelled, shucked or unshucked corn, wheat, or other grain, salt, or other feed has been distributed or scattered as the result of bona fide agricultural operations or procedures ....

50 C.F.R. § 20.21(I)(2) (1996).

northward for approximately 450 yards before a wooded area cuts into what would otherwise be a nearly perfect rectangle. The tree line extends to the West approximately 140 yards, forming what frequently was described at trial as the "peninsula," before sloping northwest to meet the north border.

On the afternoon of the hunt, Wildlife Conservation Officers Lane Ball, Jimmy Hutson, and Don Foreman of the Mississippi Department of Wildlife, Fisheries, and Parks were patrolling in the area. The sound of gunshots drew them to the acreage leased by Bass. They watched the hunters from a wooded area for about 15 minutes and then entered the field from the west and began to check licenses. Ball walked toward the northeast corner, Hutson walked south, and Foreman went to the center of the field. The officers determined that each of the hunters had the appropriate license and that all guns were properly "plugged."[2]

While walking across the field Foreman noticed some corn chops[3] near the center of the field. Upon further inspection, the officers found four areas in which corn chops had been scattered. Each of the three largest areas had a diameter of approximately 20 to 30 yards, with chopped corn in a "V" or "U-shaped" pattern. The officers did not testify as to the size of the smaller area. The

---

[2]Permitting a maximum of three shells when fully loaded in chambers and magazines.

[3]Corn chops are broken pieces of corn that are suitable only for feeding animals.

officers also found a small label from a "Performa Brand Feeds" bag of corn chops.

The officers testified that when they entered the field four of the hunters were within 20 or 30 yards from one of the areas where the corn was located,[4] three hunters were within 50 yards of the corn,[5] and the others were between 75 and 200 yards away. The officers testified that they could see the corn chops from a distance of 30 yards.

All of the 23 hunters were charged, 22 with hunting over a baited field and Jack Bass with aiding and abetting that hunting. Eleven pled guilty; twelve, including Bass, pled not guilty and were tried before a magistrate judge.

The government produced the testimony of Lee Wilson and Charles Travis, employees of the Natural Resources Conservation Service, an agency of the U.S. Department of Agriculture. Wilson and Travis had, at Bass' request, conducted surveys of the tract four days before the hunt. Both Wilson and Travis saw corn chops in the field. Travis testified that there was "a long shot possibility" that a person in the vicinity of the corn would not have seen it. Neither Wilson nor Travis noticed the corn until they were standing directly over it.

---

[4]The four hunters were Lee, Hahn, Russo, and Slaton. Lee had changed his hunting position and had ridden a four-wheeler to the new position shortly before the officers arrived.

[5]The three hunters were Jeff Barnes, Michael Blackwell, and Dwight Blackwell.

Each defendant testified that he did not see any corn in the field, stating unequivocally that if he had seen any illegal bait his participation in the hunt would have ended immediately. Several hunters testified that they looked at the ground while walking to their hunting stations. However, each of the hunters also stated that they did not deliberately seek to ascertain if the field was illegally baited.

The magistrate judge found that the wheat seed operation was performed in accordance with normal agricultural practice and did not constitute bait under the statute. He found, however, that the cracked corn constituted illegal bait. The magistrate judge discussed the requisite standard of knowledge as set forth in United States v. Delahoussaye, 573 F.2d 910 (5th Cir. 1978), and applying that standard, held that:

> The ruling of the Court is that even in light of Delahousay, [sic] and even given the fact that the Fifth Circuit departs from the strict liability standard applied in all other Circuits of the United States in the Delahousey [sic] case, there is still a requirement in the Fifth Circuit that a hunter hunting over a field, and I say even a large field, make a reasonable inspection of the field to try to see if it is a legally planted field, which was not done in this instance.
>
> So, in summary, the finding of the Court is that each of the defendants is guilty as charged in the bill of information because of the corn chops and the finding of the Court that the corn chops would have been reasonably ascertainable with a reasonable and diligent inspection of the field by the hunters, which I think is the only reasonable interpretation

5

given to <u>Delahousey</u> [sic].

The convictions were affirmed on appeal to the district court. This timely appeal followed.

## II.

We review the defendants' convictions for sufficiency of the evidence. <u>United States v. Adams</u>, 174 F.3d 571, 578 (5th Cir. 1999); <u>United States v. Sylvester</u>, 848 F.2d 520, 522 (5th Cir. 1988). Under this standard of review we will affirm the magistrate's findings if they are supported by substantial evidence. <u>Adams</u>, 174 F.3d at 578. To reverse the defendants' convictions, this Court must conclude that no rational trier of fact could find substantial evidence establishing the defendants' guilt beyond a reasonable doubt. <u>Id.</u> This Court considers the evidence in the light most favorable to the verdict, deferring to the reasonable inferences of fact drawn by the trial court. <u>United States v. Cardenas</u>, 9 F.3d 1139, 1156 (5th Cir. 1993).

At the time these events occurred, the regulations promulgated under the Migratory Bird Treaty Act prohibited the taking of migratory game birds:

> [b]y the aid of baiting, or on or over any baited area. As used in this paragraph, "baiting" shall mean the placing, exposing, depositing, distributing, or scattering of shelled, shucked, or unshucked corn, wheat or other grain, salt or other feed so as to constitute for such birds a lure, attraction or enticement to, on, or over any areas where hunters are attempting to take them; and "baited area" means any area where shelled, shucked, or unshucked corn, wheat, or other

6

> grain, salt, or other feed whatsoever capable
> of luring, attracting, or enticing such birds
> is directly or indirectly placed, exposed,
> deposited, distributed, or scattered ....

50 C.F.R. 20.21(I)(1996).

In <u>Delahoussaye</u>, this Court held that, in order for a hunter to violate the federal prohibition on the use of bait, "[at] a minimum the bait ... must have been so situated that [its] presence could reasonably have been ascertained by a hunter properly wishing to check the area of his activity for illegal devices." 573 F.2d at 912. This Court rejected a strict liability rule, explaining that such an interpretation "would simply render criminal conviction an unavoidable occasional consequence of duck hunting and deny the sport to those such as, say, judges who might find such a consequence unacceptable." <u>Id.</u> at 912-13. On the other hand, the Court noted that "to require a higher form of scienter -- actual guilty knowledge -- would render the regulations very hard to enforce and would remove all incentive for the hunter to clear the area, a precaution which can reasonably be required." <u>Id.</u> at 913.

In the instant case, the magistrate judge, ruling from the bench, stated that:

> [t]he two things that are most damaging to the defendants in this case, ... insofar as the evidence, is (1) the tag from the bag. Somebody obviously went out there with commercially prepared corn chops in that bag, tagged as corn chops, and threw it out for the purpose of baiting doves on this field. The second thing that is the most damaging of all

7

> ... is the testimony of the two witnesses who went out there to do the survey .... Both of these witnesses, independently, and in widely disparate locations, noticed corn chops on the ground and they weren't looking for corn chops.

The Magistrate Judge also found that "the corn chops were readily ascertainable and findable and observable by someone with reasonable diligence." He further emphasized that:

> every single one of these defendants admitted on the stand that they made no effort whatsoever to walk around this field and check it out for illegal baiting, but that they all primarily relied on two things - (1) their casual traverse of the field in an effort to find a good place to hunt, and (2) the representations of Judge Bass that he had cultivated the field in accordance with the Federal regulations.

Appellants argue that they saw no grain from their hunting positions or as they walked or rode to these positions. Accordingly, Appellants contend that substantial evidence does not support their convictions. However, Appellants ignore our precedent which requires hunters to make a reasonable inspection of the area to be hunted. Delahoussaye, 573 F.2d at 912-913; United States v. Sylvester, 848 F.2d 520, 523 (5th Cir. 1988)(affirming the district court's holding that "with little effort, they [guest hunters] could have made a zigzag inspection and discovered the presence of the wheat ..." because under Delahoussaye hunters must make some effort to determine if the field is baited).

The trial judge -- who heard the witnesses -- is in a much better position than we to evaluate whether the hunters conducted

8

a reasonable inspection of the field. Except in extraordinary circumstances factual findings such as this must be left in the factfinder's hands. Consistent with Delahoussaye's reasoning, we reiterate that the migratory game laws outlawing hunting over a baited field would have no force if a hunter could be automatically exonerated if he did not see the bait. 573 F.3d at 913.

We conclude that, when viewed in the light most favorable to the verdict, the convictions are based on substantial evidence. The conservation officers found four large areas covered with corn chops near the middle of the hunted portion of the field. They also found a tag from a bag of corn chops in the area where the corn chops were scattered. Several days before the hunt, USDA agents, who were not looking for illegal bait, saw the corn chops. One of the areas covered with corn chops was located 20-30 yards directly in front of one of the hunting parties. The conservation officers testified that the corn chops were visible from 20-30 yards. The evidence revealed that the hunt occurred in the afternoon during daylight hours and that the hunters were not prevented from walking in the 50 acre field by inclement weather or for any other reason. In sum, substantial evidence supports the magistrate's finding that a reasonable inspection of the field

9

would have disclosed the illegal bait.[6]

In addition to the hunters who were convicted of hunting over a baited field, Jack Bass was charged and convicted of aiding and abetting his co-defendants in hunting over a baited field. We conclude that there was sufficient evidence to support that conviction based on the evidence that Bass arranged the hunt, invited the hunters, assisted the hunters during the hunt, and was either aware of the presence of the bait or could have discovered it had he made a reasonable inspection.

### III.

For the reasons stated above, all convictions are AFFIRMED.

---

[6] We also reject appellants' argument that the evidence failed to establish that the small amount of corn -- in relation to the relatively large amount of legally planted wheat -- would have attracted the doves. The statute does not require that the bait successfully attract birds to the field. The statute only requires proof of hunting over grain or other feed capable of luring birds into the field where the grain was placed. 50 C.F.R. 20.21(I)(1996).

POLITZ, Circuit Judge, dissenting:

I must respectfully dissent.

In affirming the convictions of these defendants, the majority has abandoned **Delahoussaye**'s holding and guiding principle: that the "should have known" form of scienter is a necessary element of the offense of hunting over a baited field.  Indeed, the phrase "should have known" is conspicuously absent from the panel opinion.

Exactly what a hunter should know is not clear.  Without doubt, the standard requires less than actual knowledge.  "'Knew' and 'did not know but should have known' are different.  One refers to actual and the other to imputed knowledge – which is to say no knowledge, accompanied by circumstances that lead the legal system to treat ignorance the way it treats knowledge."[7]  One circumstance in which the law equates ignorance with knowledge is when the defendant takes affirmative steps to shield himself from that knowledge.[8]  In such cases, the defendant is charged with knowing what he deliberately has prevented himself from learning.  **Delahoussaye** does not address this situation, and indeed the government has made no such allegation against the appellants in the case at bar.  Another such circumstance arises when the defendant is under a duty to make a

---

[7]**Contract Courier Services, Inc. v. Research and Special Programs Admin.**, 924 F.2d 112 (7th Cir. 1991).

[8]**United States v. Restrepo-Granda**, 575 F.2d 524, 528 (5th Cir.) *cert. denied*, 439 U.S. 935, 99 S.Ct. 331, 58 L.Ed.2d 332 (1978).

reasonable inquiry, but has failed to do so, and knowledge of the actual facts would have been obtainable by such an inquiry. In these cases, unlike the deliberate ignorance cases, the defendant is not charged with having knowledge but is nonetheless criminally liable for having the less culpable mental state of negligence.[9] Such an instance might arise either because the defendant has knowledge of circumstances that ordinarily would lead a prudent person to conduct an investigation, or because the law creates such a duty.[10] Again, the government

_____

[9]**United States v. Bader**, 956 F.2d 708, 710 (7th Cir. 1992) ("'Should have known' is closer to negligence than knowledge.").

[10]**Contract Courier Services, Inc.**, 924 F.2d 112. Our prior cases have not held that a duty to inspect is inherent in the should have known standard. In **United States v. Garrett**, 984 F.2d 1402 (5th Cir. 1993), we applied the "should have known" standard to the prohibition under the Federal Aviation Act, 49 U.S.C. § 1472(l), against attempting to board an aircraft while carrying a concealed dangerous weapon. Regina Kay Garrett was stopped by New Orleans airport security while attempting to board an airplane when the security guard monitoring the X-ray scanner noticed a dark mass in her hand bag. She consented to a search and a hand gun was discovered. Garrett said she had forgotten the gun was in her purse and asserted that she could not be convicted under § 1472(l) without proof she had actual knowledge that the gun was in her purse. We concluded that the statute did not require actual knowledge, and instead applied the "should have known" standard, concluding that Garrett's case was "most akin to **Delahoussaye**."
We found that there was sufficient evidence to support the magistrate's finding that Garrett should have known she was carrying a gun when attempting to board the airplane. This evidence consisted of facts that would have caused a reasonable person to inspect their own hand bag. Garrett acknowledged that she had placed the gun in the bag herself and had simply forgotten about it. She also admitted that she knew at the time that she previously had carried the gun in that bag. Further, there were two large signs in the area of the security checkpoint that

does not allege the former circumstance. The prosecution does not suggest that any of the defendants were aware of facts that should have made them suspect the presence of bait or made them aware of the need to investigate further. Instead, the government insists, and the majority holds, that **Delahoussaye** and **Sylvester** impose on every hunter a legal duty to inspect the entire area hunted, even if the hunter has no reason to suspect that bait might be present. I cannot agree that **Delahoussaye**, **Sylvester**, or right reason supports the imposition of such a duty.

In drawing its conclusions, the majority relies on the following language from **Delahoussaye**:

> We also conclude that [at] a minimum the bait or the callers must have been so situated that their presence could reasonably have been ascertained by a hunter properly wishing to check the area of his activity for illegal devices.[11]

Far from imposing a universal duty to inspect, I understand this passage to limit the

---

should have reminded Garrett of the need to check her bag. The **Garrett** court did not read a duty to inspect into **Delahoussaye**'s "should have known" standard. If it had, there would have been no need to discuss the foregoing evidence because she could have been found guilty based entirely on her failure to know the contents of her purse.

See also, **United States v. King**, 1992 WL 73358 (E.D. La. April 2, 1992) (finding defendant should have known bait was present, not because he should have inspected the area, but because he was 400 yards from a plainly visible grain elevator, the whole area reeked of grain, and the birds had begun flying in patterns consistent with bait influence).

[11]**Delahoussaye**, 573 F.2d at 912.

scope of the hunter's criminal liability. To be sure, the hunters in **Delahoussaye** were under a duty to inspect their hunting area, but the duty arose because they had reason to suspect that their hunting area was baited. They were hunting less than 300 yards from calling live decoys and piles of cracked corn, "with ducks flying directly over [their] blind to these enticements."[12] The above-cited passage makes clear, however, that the hunters would not have been liable under § 703 if the bait and callers had been positioned where they could not have been found during a reasonable inspection. This much is evident from the court's use of the phrase "at a minimum." I understand that passage to state the rather obvious point that we will not say the hunter "should have known" that which he could not discover. In fact, the **Delahoussaye** court went on to explain that "there could be no justice" in convicting one who has been barred by a property line from ascertaining that birds were being pulled over him by bait hidden from view.

As the majority notes, the **Delahoussaye** court rejected actual guilty knowledge as the level of scienter in order to preserve the "incentive for the hunter to clear the area, a precaution which can reasonably be required." At best, it is ambiguous as to when that incentive exists. I am persuaded that Judge Gee

---

[12]**Delahoussaye**, 573 F.2d at 912.

14

intended to preserve the incentive for the hunter to clear the area under circumstances where he should have known that bait might be present. This reading is most consistent with the should have known standard announced earlier in the opinion and would, of course, have been undermined if the court had adopted a requirement of actual knowledge. Others, including the majority, believe that Judge Gee was referring to the hunter's incentive to inspect under all circumstances. Given this ambiguity, the most that can be said of **Delahoussaye** is that it left the door open for later cases to impose a duty to inspect and to define its parameters.

Judge Gee had an opportunity to revisit this issue ten years later in his writings in **Sylvester**. He acknowledged that his opinion in **Delahoussaye** was "[u]nique among the Circuits" in that it did not apply a strict liability standard. Perhaps for this reason, and perhaps because the Congress recently had expressed its preference for a strict liability standard under § 703,[13] Judge Gee moved our standard closer to strict liability by reading an inspection requirement into **Delahoussaye**. He stopped short of strict liability, however, by requiring only a

---

[13]S.Rep. No. 445, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 6114, 6128 ("Nothing in this amendment is intended to alter the 'strict liability' standard for misdemeanor prosecutions under 16 U.S.C. § 707(a), a standard which has been upheld in many Federal court decisions").

minimal inspection.  The district court in **Sylvester** had concluded that the hunters traversed close to the baited area and that they could have discovered the bait with "little effort" or a "zig-zag" inspection.   Judge Gee agreed, stating that **Delahoussaye** requires hunters to make "some effort" to detect bait.

Neither **Delahoussaye** nor **Sylvester** can fairly be read to impose a duty to inspect more than the area around a hunting position and the path the hunter traversed to get there.  Although each of the appellants conceded he had not conducted an inspection, the essential question herein is not whether such an inspection was made, but whether such an inspection would have revealed verboten bait.  Clearly this is not the case for the majority of the appellants, who were never within 50 yards of any of the areas containing corn.  Even if they had expended "some effort" or had undertaken a "zig-zag" inspection, whatever that is, it is not likely that they would have discovered the distant minimal amount of chopped corn.[14]

_____

[14]Witnesses estimated that the entire field contained a total of about five pounds of corn, or "enough to fill a bucket."  I also note that the testimony of the surveyors, upon which the magistrate relied heavily in concluding that the corn was "readily ascertainable," was that they did not see the corn until after they had stepped out of their trucks and were standing directly on top of it looking down at the ground.  The only witness who testified that the corn was visible from any distance was Officer Lane Ball, who, rather than actually discovering the corn from a distance of 30 yards, estimated that he could have seen the corn from 30 yards

16

The majority reads an even greater requirement into **Delahoussaye** by redefining the scope of the required inspection in terms of reasonableness. My principal objection to this approach is that it is impracticable. The majority has failed to give hunters dedicated to legal hunting any guidance as to the scope of a reasonable inspection. Is a person invited to hunt at the King Ranch in Texas liable for grain that might exist anywhere on the nearly one million acres the ranch is reported to include? How much of the ranch is it "reasonable" to inspect? The geographic scope of liability cannot reasonably be defined with reference to § 703's requirement that the hunting take place over a "baited area," because the "baited area" includes the entire area over which the bait might exercise an attraction[15] and can extend miles away from the bait. In fact, "baited area" has been held to include areas where there is no bait at all.[16]

The majority seems to suggest that the reasonableness of an inspection is an issue of fact that can be resolved by trial judges, taking into account such factors

---

after he already knew it was there. In fact, several of the defendants testified that Officer Don Foreman, the conservation agent who happened upon the corn, had difficulty locating it again when the defendants asked to see it.

[15]**Delahoussaye**, 573 F.2d at 912.

[16]**United States v. Ardoin**, 431 F.Supp. 493 (W.D. La. 1977) (holding that "baited area" included pond neighboring a lake where there had been illegal bait prior to the day of the hunt).

17

as weather conditions, available daylight, and the condition of the hunted area. This approach is similar to the manner in which we have defined "baited area," which, as Judge Gee noted, "is not subject to exact definition and may expand or contract with changes of wind and weather, but hunters must make many such judgments as these in order to hunt at all."[17] Unlike the determination of the area over which bait might exercise an attraction, however, the determination as to how a court might define a legally imposed duty to inspect a field is not one that would permit me to say so glibly "hunters must make many such judgments as these in order to hunt at all." This underscores the circularity in the majority's resolution. **Sylvester** rejected reasonableness as the ultimate determinant as to whether a hunter must conduct an inspection. Instead, it imposed a duty to inspect as a matter of administrative convenience. The majority now defines this legally imposed duty in terms of what the reasonable hunter would do under the circumstances. But the reasonable hunter wants only to comply with the law; he has no reason to inspect for bait apart from his legally imposed duty to do so.[18] Indeed, if conducting such

---

[17]**Delahoussaye**, 573 F.2d at 912.

[18]While reasonable hunters typically inspect their hunting areas for their own safety and the safety of others, the panel opinion makes it clear that the duty to clear the area of bait is broader than that. Each of the appellants, while acknowledging that he had not looked specifically for bait, testified that he inspected the ground on the way to his hunting position to make sure the field was

an inspection was something a reasonable hunter did, our opinions would not have to impose a duty to do it. This problem is exacerbated by the fact that in the 22 years since **Delahoussaye** was decided, this court and its subordinate courts have not once considered whether an inspection undertaken by a hunter was "reasonable."

By extending the duty to inspect from the minimal inspection required in **Sylvester** to the broader inspection required in this case, the majority has virtually eclipsed the should have known standard and moved this circuit very close to the former strict liability standard that applied in several of the other circuits. As I understand the majority's approach, a hunter is strictly liable for any ascertainable amounts of illegal bait that might exist in a largely undefined area. Although it is too late for these appellants, Congress recently has provided relief under § 704 by adopting a "reasonably should have known" form of scienter similar to the one previously applied in this circuit.[19] Because of this fortunate legislative

_____

safe. The fact that each of these experienced hunters believed that no more than a cursory inspection of the field was necessary in order to guard their own well-being belies the notion that an exhaustive inspection of the entire area is somehow inherently reasonable.

[19]16 U.S.C. § 704 now reads:

(b) It shall be unlawful to –
(1) take any migratory game bird by the aid of baiting or on or over any baited area, if the person knows or reasonably should know that the area is a baited area.

intervention, what I view as the unworkable standard in the panel opinion will have little opportunity to work mischief to responsible, well-intentioned hunters. That is a consummation much to be desired.