**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Chester SYLVESTER, Ted Burn Sylvester, Floyd Soileau, Timothy Sylvester, and Jules Ericke, Defendants–Appellants.**

No. 87–4496.

United States Court of Appeals,
Fifth Circuit.

June 21, 1988.

Rehearing Denied Aug. 15, 1988.

James S. Gates, Patrick C. Morrow, Opelousas, La., for defendants-appellants.

Robert C. Lunnen, John A. Broadwell, Asst. U.S. Attys., Shreveport, La., for plaintiff-appellee.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

The district court found defendants guilty of hunting on a baited field in violation of the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703 et seq., and 50 C.F.R. § 20.21(i). Substantial evidence supports, and we thus affirm, these convictions. One defendant was additionally convicted of taking a migratory non-game bird in violation of the Act. A federal agent obtained evidence of this violation during a search of defendant's hunting box. We remand the suppression issue raised by this search to the district court for further consideration.

FACTS

These gamesmen tacked too close to the harvest wind. Three days before the opening of dove hunting season, an agent of the United States Fish and Wildlife Service noticed that one acre of a seventeen acre tract of land was disked in an unusual pattern and was unevenly spread with seed. Two days before opening day a state agent inspected the field and declared that in his opinion the field was legal to hunt. After this declaration and before opening day, additional grain was spread on the tract of land.

The federal agent returned to the field on opening day and cited defendants for hunting a baited field. Later, seven hunters were charged with taking or attempting to take migratory game birds with the aid of bait in violation of the MBTA. Tim Sylvester was also charged with aiding and abetting the illegal activities. Chester Sylvester was additionally charged with tak-

ing a migratory non-game bird (a Mexican ground dove) for which there is no open season. At a bench trial, the judge found two hunters innocent, convicted Timothy Sylvester of aiding and abetting, and found all others guilty as charged.

ISSUES

Defendants argue three issues in this appeal: 1) there was not substantial evidence to support their convictions, 2) statements made in response to questions by the federal agent should have been suppressed at trial, and 3) the search of a closed hunting box violated the Fourth Amendment and thus its contents should have been suppressed.

### 1. *Sufficiency of the Evidence*

■ Defendants argue that the field was baited as part of bona fide agricultural operations, as permitted in the regulation.[1] The district court found otherwise.

The Court finds that a large portion of the disked area from the left to the center of the tract contained no grain. The distribution of wheat in the one-acre tract constituted a lure for birds and was, in the Court's opinion, not scattered solely as a result of a bona fide agricultural procedure, as only a small portion of the disked area was covered. Although there was some testimony to the contrary, the evidence is clear, in the Court's opinion, that no serious attempt was made to apply grain by air to the entire disked area of this tract.

We review the evidence "in the light most favorable to the government and affirm if substantial evidence supports the convictions." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *United States v. Livingston,* 816 F.2d 184, 192 (5th Cir.1987).

Aside from the pattern of distribution noted above by the district court, much more evidence supports the convictions. The disked area doubled during the forty-eight hour period before opening day. The grain that was dumped onto the field was unfit for planting ground cover or sowing a cash crop: it was moldy, clumpy, and still contained the chaff. An expert witness testified that the seeding was inconsistent with bona fide agricultural purposes. Defendants' argument falls before this substantial evidence.

■ Defendants also argue that they neither knew nor should have known that the field was baited. Unique among the Circuits, we require a minimum level of scienter as a necessary element for an offense under the MBTA. *United States v. Delahoussaye,* 573 F.2d 910, 913 (5th Cir. 1978). In *Delahoussaye,* we held that hunters cannot be held strictly liable for violating the MBTA. Recognizing that actual guilty knowledge "would render the regulations very hard to enforce," we settled for the "should have known" form of scienter. *Id.*

A state wildlife agent advised Tim Sylvester two days before the hunt that the field appeared not to be baited. Defendants contend that reliance upon the state agent's advice bars them from any conviction for which a minimum level of scienter is required. This argument would be attractive if the hunters had solicited the state agent's opinion on the morning of the hunt. The agent gave his opinion to Tim Sylvester, however, *before* the field's disked area doubled in size and additional grain was spread.

Substantial evidence suggests that all defendants knew or should have known that the field was baited. Three defendants participated in or knew about the grain spreading activities on the land. They should have known the effect these activi-

---

1. The regulation provides:

No person shall take migratory game birds:

\*   \*   \*   \*   \*   \*

(i) By the aid of baiting, or on or over any baited area.... However, nothing in this paragraph shall prohibit:

\*   \*   \*   \*   \*   \*

(2) The taking of all migratory game birds, except waterfowl, on or over any lands where shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed has been distributed or scattered as the result of bona fide agricultural operations or procedures....

50 C.F.R. § 20.21 (1986).

ties would have on bird hunting. As for the other two defendants, the district court held:

> [T]he Court cannot determine exactly how close the guest hunters came to the baited area on the way to their hunting stations, and there was no discernible grain on the disked area that they traversed.... Be that as it may, the entrance to the tract of land and the path the guest hunters took was fairly close to the baited area, and, with little effort, they could have made a zigzag inspection and discovered the presence of wheat....

*Delahoussaye* directs hunters to make some effort to determine if the field on which they hunt is baited. Substantial evidence supports the district court's finding that the guest hunters should have known the field's baited status.

### 2. *Failure to Give Miranda Warnings*

In addition, defendants argue that the district court erred in failing to grant their motion to suppress statements made after the federal agent detained them. Police need not give parties *Miranda* warnings at every detention. In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court held that roadside questioning of a motorist detained pursuant to a traffic stop did not constitute "custodial interrogation," and thus *Miranda* warnings were not necessary. The key issue was whether defendants were "subjected to restraints comparable to those associated with a formal arrest; ... the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." 468 U.S. at 441–42, 104 S.Ct. at 3151. The Court emphasized two features of ordinary traffic stops that mitigate the dangers of coercion: 1) "detention of a motorist pursuant to a traffic stop is presumptively temporary and brief;" 2) "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." 468 U.S. 437–38, 104 S.Ct. at 3148–49.

In discussing the first feature, the Court pitted the extremes of a traffic stop against that of a stationhouse interrogation, and found it to be significant that motorists who are detained and questioned may be given a citation "but that in the end he most likely will be allowed to continue on his way." *Id.* The Court's discussion of the second feature highlighted the public nature of the stop and the few policemen encountering the suspect. These circumstances were contrasted with two cases in which the Court had applied *Miranda: Orozco v. Texas*, 394 U.S. 324, 325, 89 S.Ct. 1095, 1096, 22 L.Ed.2d 311 (1969) (suspect arrested and questioned in his bedroom by four police officers); *Mathis v. United States*, 391 U.S. 1, 2–3, 88 S.Ct. 1503, 1503–04, 20 L.Ed.2d 381 (1968) (defendant questioned by a Government agent while in jail).

The features emphasized in *Berkemer* are particularly applicable here. The detention and questioning of these hunters was "substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself." 468 U.S. at 439, 104 S.Ct. at 3149. Each defendant was briefly questioned by a lone agent in an open field in view of the other defendants. Even after being cited, defendants remained on the field and asked questions.

Defendants were instructed to proceed to a central meeting place where their vehicles were blocked by the agents' vehicles. The mere fact that the hunters were requested to gather together for purposes of discussing the reasons for the citations does not make their detention comparable to a formal arrest. Further, having their vehicles blocked by the agents' vehicles did not make the questioning of the individual hunters by lone agents when the hunters were still in the open field coercive.

The facts here are similar to the circumstances addressed in *Berkemer*. The hunters could properly presume that they would be allowed to continue on their way once citations were issued and only one agent approached and questioned each hunter in the open field. Because we do not find these detentions custodial in nature, the

questioning did not constitute a custodial interrogation requiring the issuance of *Miranda* warnings.

### 3. *Illegal Search*

As the agents spread through the field approaching the hunters individually, one agent opened the lid of a "hunting box" that was not presently attended by a hunter. The owner of the box, Chester Sylvester, argues that the agent's actions constituted an illegal search of his private property, and thus that the Mexican ground dove discovered inside the container should have been suppressed at trial.

"A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). If a suspect is found to have no expectation of privacy in an object or place searched, then Fourth Amendment concerns are not implicated.

The government argues that Chester Sylvester did not have a reasonable expectation of privacy in the hunting box. In support of its contention, the government notes that 1) other hunters could have opened the box, 2) no one was in view when the agent opened it, 3) the box contained no identifying marks or locks, 4) boxes of this type are used to store hunting paraphernalia such as food, drinks, shells and doves, not private articles usually found in footlockers, briefcases and luggage, and 5) the container had been abandoned when initially observed by the agent. The factors listed by the government here raise three legal issues: 1) whether the owner permitted others common access to the box, and if so what effect this had, 2) whether the contents of the box could be inferred from its outward appearance, or 3) whether the box had been abandoned by its owner.

The government argues that because the utility of the hunting box differs from footlockers, briefcases and luggage, we should find that no reasonable expectation of privacy should exist toward the container or the items found within it. As support for this argument, the government cites *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). *Sanders* held that the warrant requirement of the Fourth Amendment applies to personal luggage taken from an automobile, and that barring exigent circumstances, officers could not conduct a warrantless search of the luggage. In a footnote, the court indicated that all containers are not created equal in terms of one's privacy expectation in them.

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant. See *Harris v. United States*, 390 U.S. 234, 236, 19 L.Ed.2d 1067, 88 S.Ct. 992 [993] (1968) (per curiam). There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile.

442 U.S. at 764 n. 13, 99 S.Ct. at 2593–94 n. 13.

The footnote acknowledges that under the plain view doctrine and in special circumstances where a container's "contents can be inferred from [its] outward appearance," the possessor cannot claim an expectation of privacy in the container or its contents. The examples given of containers that manifest their contents, however, are narrowly prescribed. If a violin case is found to contain a machine gun, so much the worse for its owner. A package or kit that does not somehow reveal its contents would not be covered by the outward appearance rule.

The government argues, however, that if one possesses a bag or container that is often used to carry things that are not of a private nature, then one has no expectation of privacy in it, unless the owner takes some additional positive step objectively signalling to others an expectation that the privacy of the container's contents will be respected. As support for this position, the government cites *United States v. Dien*, 609 F.2d 1038, 1044–45 (2d Cir.1979), *adhered to on rehearing*, 615 F.2d 10 (2d Cir.1980) and *United States v. Markland*, 635 F.2d 174 (2d Cir.1980). We refrain from following the Second Circuit's path in this area. Otherwise, we would be left with the task of categorizing containers based upon whether or not they are "inevitably" used for the storage of private effects. An approach which we believe comes closer to the proper interpretation of *Sanders* is to hold strictly to the rule that a container cannot be opened unless its contents are in plain view or they can be inferred from the container's outward appearance. As a district court in our Circuit held in addressing this same issue: "One man's garbage bag is another man's luggage." *United States v. Rivera*, 486 F.Supp. 1025, 1034 (N.D.Tex.1980).

A photographer's camera bag often contains items associated with taking pictures: film, lens cloth, extra lenses, collapsible tripod, etc. One could not say, however, that because the items found in the bag usually are not of an especially private type, the owner of the bag has no expectation of privacy in it. One simply cannot infer what is in the camera bag from its outward appearance. The same principle applies to Chester Sylvester's hunting box. Although ammunition, beer, and chewing tobacco may often be carried in such boxes, such contents cannot be *inferred* from simply looking at the box. We conclude that Chester Sylvester could reasonably have maintained an expectation of privacy in the box.

The government also argues that even if Sylvester once held an expectation of privacy in the box, he abandoned his privacy interest when he walked to a hunting post not within sight of the box. Whether property has been abandoned is a question of intent, which may be inferred from all the relevant facts and circumstances. *United States v. Manning*, 440 F.2d 1105 (5th Cir.), cert. denied, 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971). The government argues that the box "appeared to have been abandoned," but the relevant facts and circumstances do not instruct, as a matter of law, that Sylvester *intended* to abandon the property. He simply was not within sight of the box when the agent opened it. The government does not cite any cases that hold as a matter of law that being out of sight of one's personal effects in a public place forfeits one's expectation of privacy in the effects. One court has held, for example, that leaving an airport without claiming one's luggage did not constitute abandonment, *United States v. Sanders*, 719 F.2d 882 (6th Cir.1983). The district court disposed of this issue by following the path set forth in *Dien*, one that we elect not to follow. Because the court did not find whether the owner permitted others common access to the box (and, if so, what effect this had) and did not resolve the factual issue of whether Sylvester intended to abandon the box, we REMAND this suppression issue for reconsideration.

## CONCLUSION

Sufficient evidence supports the convictions of all the hunters for their hunting activities on the baited field. Because we find that the contents of the hunting box could not be inferred from its outward appearance, we REMAND the Fourth Amendment suppression issue to the district court for reconsideration.

AFFIRMED in part, VACATED in part, and REMANDED.