NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3456
_____

UNITED STATES OF AMERICA

v.

TOMMIE  TELFAIR a/k/a "Hassan Gatling",
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 2:08-cr-00757-001)
District Judge: Honorable Dennis M. Cavanaugh
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 11, 2012


Before: GREENAWAY, JR., and NYGAARD and VAN ANTWERPEN, Circuit Judges

(Filed: December 12, 2012)
_____

OPINION OF THE COURT
_____

VAN ANTWERPEN, Circuit Judge.

## I.

Tommie Telfair a/k/a "Hassan Gatling" ("Telfair") appeals from a judgment of

conviction for violations of 21 U.S.C. § 846, 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 18

U.S.C. § 2.  His court-appointed counsel has filed a motion to withdraw and a brief in

support of his motion ("*Anders* brief") pursuant to *Anders v. California*, 386 U.S. 738 (1967) and Local Appellate Rule ("L.A.R.") 109.2(a). Though counsel's *Anders* brief should have been more thorough, our independent review of the record reveals no nonfrivolous issues on appeal. Accordingly, we will grant counsel's motion to withdraw and affirm the judgment of the District Court.

## II.[1]

On September 5, 2006, the Newark Police Department received a call that shots had been fired at 185 Parker Street, Newark, New Jersey. Jennifer Filpo ("Filpo") and Catherine Sanchez ("Sanchez"), two of the occupants of 185 Parker Street, were at the residence when police arrived, and informed the police that they had called 911 because someone shot at the rear of the residence. Filpo and Sanchez allowed the police into the residence. The police proceeded to the kitchen area in the rear of the premises, where they found bullet holes in the door between the kitchen and the backyard, and damage from gunfire in the kitchen. Detectives from the robbery unit arrived and found shell casings in the backyard near the kitchen door. Detective Pablo Gonzalez noticed bullet holes on the refrigerator, and opened it in search of evidence of the shooting. Inside the refrigerator, he saw a projectile and, in a separate drawer, two clear containers holding what appeared to be heroin. The detective seized the containers and performed a field test on the substance. The substance tested positive for heroin.

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

Detective Luigi Corino noticed a bullet hole in the kitchen floor, and traced the trajectory to locate the projectile. He concluded the bullet traveled into the basement. After asking Filpo and Sanchez how to get into the basement, the detective followed the bullet's trajectory and discovered that it had traveled into a room that was behind a locked door. After Filpo and Sanchez indicated they did not have a key to that door, Corino forced it open. Behind the door, Corino discovered a heroin mill.[2] Filpo and Sanchez were arrested and taken into custody. In total, 130 grams of heroin were found at 185 Parker Street.

The Drug Enforcement Administration ("DEA") was notified that a heroin mill had been found at 185 Parker Street. DEA agents interviewed Filpo and Sanchez, who both identified Telfair as the owner or controller of the heroin mill. The DEA obtained a warrant to search 185 Parker Street for drug evidence and for evidence linking Telfair to the premises. When DEA agents executed the warrant, they collected the drug evidence from the basement and seized documentary evidence connecting Telfair to the location.[3]

---

[2] A heroin mill is a processing center in which bulk quantities of heroin are mixed with other materials to add volume, and are then packaged into individual doses for street-level distribution. The heroin mill at 185 Parker Street contained a long table with a scale on it, a blender, stamps and inkpads used to place heroin "brands" on envelopes and bags, boxes of new and used glassine envelopes used to package heroin, and a computer.

[3] This evidence included: rent receipts for 185 Parker Street in the name of "Tommy Hassan" (another of Telfair's aliases); a receipt for "Hass" (another alias) for rims for a 1998 Lincoln Navigator; a letter from DirecTV addressed to Hass Gatling at 185 Parker Street, Newark, New Jersey; three letters from Meg Radio to Hass Gatling at 185 Parker Street; a letter from Chase to Hass Gatling at 185 Parker Street; a letter from Cablevision to Hass Gatling at 185 Parker Street; a bill from Cablevision to Hass Gatling at 185 Parker Street; and a bill from Gold Touch Carpet and Flooring to Hass at 185 Parker Street. The owner and landlord of 185 Parker Street also testified that he had been renting the premises to Telfair at the time the heroin was found, that Telfair had made

Shortly after the shooting, the DEA attempted to find Telfair at the residence of his girlfriend, Catrina Gatling ("Gatling"), but she denied knowing Telfair. The DEA then obtained an arrest warrant for Telfair. On January 23, 2007, Telfair was arrested outside Gatling's residence. After he was Mirandized, Telfair admitted he was a heroin dealer, and told the DEA agents that he had been leaving to meet his heroin supplier, Carlos Alberto Antigua ("Carlito"), when he was arrested. Carlito repeatedly called Telfair during the interview.

Carlito testified at trial that he began supplying heroin to Telfair in late August 2006. At the height of the relationship, Telfair was purchasing 100 bricks of heroin every three days. This continued for roughly four months. During this period, Carlito sold between four and five kilograms of heroin to Telfair.

An indictment was returned against Telfair on March 29, 2007, charging him with one count of conspiracy to distribute and to possess with intent to distribute 100 grams or more of heroin.[4] A superseding indictment was filed on May 7, 2007, charging Telfair with conspiracy to distribute one kilogram or more of heroin.[5] On April 7, 2008, the District Court held a hearing regarding several motions filed by Telfair's then-counsel, James Kimball, including a motion to suppress the evidence seized from 185 Parker Street. The District Court denied the motions and issued a written order, without an

---

several renovations to the property, and that he had never informed the landlord of an intent to leave or to sublet the premises to Filpo and Sanchez.

[4] 21 U.S.C. §§ 841(a), 841(b)(1)(B)(I), and 846.

[5] 21 U.S.C. §§ 841(a), 841(b)(1)(A)(I), and 846.

accompanying opinion, on May 20, 2008. On October 7, 2008, this indictment was dismissed without prejudice due to violations of the Speedy Trial Act, 18 U.S.C. § 3161.

On October 8, 2008, a second indictment was returned against Telfair, charging him with one count of conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin,[6] and one count of distribution and possession with intent to distribute 100 grams or more of heroin.[7] Though represented by counsel, Telfair filed a number of pro se motions, including a motion to suppress the evidence seized from 185 Parker Street, which were nearly identical to the motions filed under the prior indictment. The District Court denied these motions in a December 10, 2008 opinion, noting it had denied "substantially similar" motions in its May 20, 2008 Order. The court found the officers' warrantless entry of 185 Parker Street justified by the consent of Filpo and Sanchez. The court also concluded the search was justified by the plain view exception to the warrant requirement.

In March 2009, roughly one year before trial, Mr. Kimball was replaced by Michael Pedicini as counsel for Telfair. Telfair demanded that Mr. Pedicini file new motions on many of the same subjects and based on the same arguments as the earlier motions. Mr. Pedicini declined, saying "my position with regard to motions is, if they've been filed and argued and denied, you can't refile them until you get the answer you want." (Pretrial Transcript ("P.Tr.") at 14).

---

[6] 21 U.S.C. §§ 841(a), 841(b)(1)(A)(I), and 846.
[7] 21 U.S.C. §§ 841(a), 841(b)(1)(B), and 18 U.S.C. § 2

After a jury trial, during which he was represented by Mr. Pedicini, Telfair was convicted on both counts of the indictment. At the sentencing hearing, the District Court calculated Telfair's Guidelines range at 360 months' to life imprisonment, but determined that this range was overly harsh, and so imposed a sentence of 240 months' imprisonment. Telfair filed a timely notice of appeal, and John Azzarello, who represented Telfair at sentencing and is representing him on appeal, filed a motion to withdraw as defense counsel and an accompanying *Anders* brief.

### III.

In *Anders v. California*, the Supreme Court of the United States described the procedure by which court-appointed appellate counsel may withdraw from representing a criminal defendant without offending the defendant's Sixth or Fourteenth Amendment right to counsel.[8] 386 U.S. 738, 744 (1967). This Court has adopted Local Appellate Rule ("L.A.R.") 109.2(a), which requires the same process as the one described in *Anders*. *United States v. Marvin*, 211 F.3d 778, 780 (3d Cir. 2000). When we receive a motion to withdraw and an accompanying *Anders* brief, our inquiry is twofold. *United States v. Youla*, 241 F.3d 296, 300 (3d Cir. 2001). We first determine "whether counsel adequately fulfilled the rule's requirements." *Id.* We then conduct "an independent review of the record" to determine whether any nonfrivolous issues exist. *Id.*

---

[8] The Court stated that "if counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal." *Anders v. California*, 386 U.S. 738, 744 (1967).

To fulfill the first prong, counsel's brief must "satisfy the court that counsel has thoroughly examined the record in search of appealable issues" and "explain why the issues are frivolous." *Id.* Counsel "need not raise and reject every possible claim," so long as she demonstrates she has made a "conscientious examination" of the record. *Id.* An issue is frivolous "where none of the legal points are arguable on their merits." *Simon v. Gov't of Virgin Islands.*, 679 F.3d 109, 114 (3d Cir. 2012).

A finding that an *Anders* brief is inadequate does not preclude us from affirming the conviction without appointing new counsel; if we determine, after our independent review of the record, that there are no nonfrivolous issues, we may affirm the judgment. *United States v. Coleman*, 575 F.3d 316, 321 (3d Cir. 2009). When conducting an independent review of the record, the court need not comb the record in search of appealable issues. *Youla*, 241 F.3d at 301 (citing *United States v. Wagner*, 103 F.3d 551, 553 (7th Cir. 1996)). If the *Anders* brief is adequate, our review will be guided by that brief. *Id.* If the *Anders* brief is inadequate, we may rely on the appellant's *pro se* brief to guide our review. *Id.* The determination of whether an issue is frivolous is informed by the standard of review to which that issue is normally subject. *See United States v. Schuh*, 289 F.3d 968, 974-76 (7th Cir. 2002).

## A. Adequacy of Counsel's *Anders* Brief

In our view, Telfair's appellate counsel, Mr. Azzarello, has not fully demonstrated that he has "thoroughly examined the record in search of appealable issues." *Youla*, 241 F.3d at 300. In his *Anders* brief, Mr. Azzarello discussed five issues, and concluded that appeal on each of those issues would be frivolous. Three of those issues were raised by

Telfair in his *pro se* filings: alleged ineffective assistance of counsel, challenges to the sufficiency of the indictment, and allegations of discovery violations. Mr. Azzarello also raised two issues which Telfair did not discuss in his *pro se* filings: the District Court's denial of motions for a mistrial, and the propriety of the sentencing proceedings.

Though Mr. Azzarello raised issues not discussed in any of Telfair's numerous and lengthy *pro se* filings, he failed to discuss one issue that was consistently raised by Telfair, at both the trial and appellate levels: the District Court's denial of Telfair's motion to suppress. Defense counsel's failure to address issues raised by her client in his *pro se* filings is evidence that defense counsel's *Anders* brief is inadequate. *Youla*, 241 F.3d at 301; *Marvin*, 211 F.3d at 781–82.

In his *pro se* filings, Telfair alleged the evidence from 185 Parker Street was discovered as a result of a warrantless, and therefore unreasonable, search. The dockets for this case and for the case under the first indictment show Telfair vigorously litigated this issue. In the proceedings against Telfair, the Government twice filed briefs responding to a motion to suppress the evidence found at 185 Parker Street, and the District Court twice issued orders addressing this issue. Telfair's trial counsel, Mr. Pedicini, explicitly noted that he was not filing a new motion to suppress because the court had already ruled on the matter and because Telfair had preserved his right to appeal. The frequency of the litigation below regarding the search at 185 Parker Street and Telfair's continual mention of it in his filings should have alerted counsel of the need to address the issue.

In addition, the importance of the evidence seized from 185 Parker Street to the Government's case, and the circumstances of its discovery, should have alerted Mr. Azzarello that he must address the issue. The heroin found at 185 Parker Street was the source of the investigation of Telfair; if this evidence is tainted, it is not "fruit of the poisonous tree," but rather is the *root* of the poisonous tree. This evidence provided the foundation for the investigation and prosecution of Telfair. Without that foundation, the case collapses. Furthermore, because this quintessential evidence was discovered during a warrantless search--which is *per se* unreasonable, subject to a few, narrow exceptions, *Katz v. United States*, 389 U.S. 347, 356 (1967)--Mr. Azzarello was obligated to discuss the issue in his brief and explain why it would be frivolous to seek a reversal of the District Court's order.

Given the foregoing, Mr. Azzarello's *Anders* brief does not satisfy this Court that he has conducted a thorough examination of the record in search of appealable issues. Finding that his *Anders* brief is inadequate, we proceed to step two of the analysis, and conduct an independent review of the record to determine whether any nonfrivolous issues exist. *Coleman*, 575 F.3d at 321; *Youla*, 241 F.3d at 301.

**B. Independent Review of the Record**

This Court has held that if an *Anders* brief is insufficient, we may still grant counsel's motion to withdraw and affirm the judgment if independent review of the record demonstrates that appeal would be frivolous. *Coleman*, 575 F.3d at 321–22. Recognizing that Mr. Azzarello failed to discuss the Fourth Amendment issue, the Government argues the Fourth Amendment claim is frivolous because the search of the

9

refrigerator was justified by the exigent circumstances and plain view exceptions.[9]  We

first address the lawfulness of the warrantless entry into 185 Parker Street before

discussing the permissibility of the warrantless search of the refrigerator inside the

kitchen of 185 Parker Street.

### 1.  *The Initial Entry into 185 Parker Street*

In its December 10, 2008 Opinion, the District Court stated the officers'

warrantless entry into 185 Parker Street was justified by the consent of Filpo and Sanchez

and by exigent circumstances.  We review a district court's determination of consent for

clear error.  *United States v. Kim*, 27 F.3d 947, 954–55 (3d Cir. 1994).

The Government "has the burden of proving that the consent was, in fact, freely

and voluntarily given."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (citations

and internal quotation marks omitted).  To assess the voluntariness of consent, we use a

totality of the circumstances analysis.  *Kim*, 27 F.3d at 955.

In this instance, the District Court did not err in finding Filpo and Sanchez

consented to the officers' entry of the premises.  Filpo and Sanchez, two of the occupants

of the premises, called 911 because someone shot at the back of the residence while they

---

[9] The Government also claims Telfair waived his ability to seek appellate review of the suppression issue because his trial counsel, Mr. Pedicini, did not file a motion to suppress.  Citing *United States v. Rose*, 538 F.3d 175 (3d Cir. 2008), in which this Court held that under Federal Rule of Criminal Procedure 12(e), a motion to suppress not timely filed may not be appealed, the Government argues Telfair cannot appeal this issue.  However, prior to Mr. Pedicini's involvement, Telfair filed a motion to suppress the evidence seized from 185 Parker Street, arguing the evidence was the fruit of a warrantless search not justified by exigent circumstances.  The District Court ruled on this motion in its December 10, 2008 Order and Opinion.  Therefore, the issue was preserved for appeal.

were inside of it. They advised the officers that they were the ones who had called 911 and they directed the police to the rear of the house and kitchen. In addition, the occupants assisted the officers in their investigation by showing them through the house. There is no evidence in the record to contradict a finding of voluntary consent.

## 2. *The search of the Refrigerator*[10]

The District Court found that the detective's warrantless search of the refrigerator was justified by exigent circumstances and the plain view exception.[11] It is well-established that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Although "the Fourth Amendment has drawn a firm line at the entrance to the house," *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (citation and internal quotation omitted), the "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam)).

---

[10] None of the pretrial motions, from either Mr. Kimball or Telfair, focused on the discovery of the heroin mill in the basement of 185 Parker Street. Any mention of this evidence is also omitted from the appellate filings of Telfair, Mr. Azzarello and the Government. We will not address the issue in depth, but we do note that the search was justified by exigent circumstances. Officers responding to the scene of a violent crime may make a warrantless search for the perpetrator or for victims. *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). Detective Corino was following the trajectory of a bullet out of concern that a victim may have been hit by that bullet, and in so doing, discovered the heroin mill.

[11] Although the District Court held the warrantless entry of 185 Parker Street was justified by consent, it did not so hold regarding the search within the premises. We cannot make a determination of consent on appeal. *See Flippo v. West Virginia*, 528 U.S. 11, 15 (1999) (per curiam) (declining to make finding of consent when trial court did not do so); *Thompson v. Louisiana*, 469 U.S. 17, 23 (1984) (per curiam) ("Because the issue of consent is ordinarily a factual issue unsuitable for our consideration in the first instance, we express no opinion as to whether the search at issue here might be justified as consensual.").

11

Therefore, once the home's threshold is lawfully crossed, police may seize evidence in plain view. *Mincey v. Arizona*, 437 U.S. 385, 393 (1978).

### a. *Elements of the Plain View Exception*

In addition to the fact that the item must be in plain view, there are three requirements for a valid plain view seizure. *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 136 (1990)). First, the officer must lawfully be in the place "from which the evidence could be plainly viewed." *Horton*, 496 U.S. at 136. Second, the officer must have a "lawful right of access to the object itself," meaning the police cannot commit illegal trespass to access the item in plain view. *Id.* at 137; *see also United States v. Davis*, 690 F.3d 226, 234 (4th Cir. 2012) ("[T]he lawful access requirement is intended to clarify that police may not enter a premises to make a warrantless seizure, even if they could otherwise see (from a lawful vantage point) that there was contraband in sight.") Third, the incriminating nature of the item must be "immediately apparent." *Horton*, 496 U.S. at 136. (citation omitted).

### b. *Lawful Presence and Access*

As established above, the officers were lawfully within the kitchen of 185 Parker Street due to the consent of Filpo and Sanchez. Because the officers were lawfully within the kitchen, their access to the refrigerator did not require illegal trespass of Telfair's property. The bullet-riddled refrigerator was within the plain view of the officers as they stood within the kitchen. The only issue is whether the bullet marks on the refrigerator made the incriminating nature of the refrigerator "immediately apparent" under the third prong of the plain view doctrine.

c. *The "Immediately Apparent" Analysis*

To satisfy the "immediately apparent" prong, the police must have probable cause to believe the object in plain view is contraband. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (citations omitted). The plain view exception is not limited to contraband, but rather applies to all incriminating evidence. *See Menon*, 24 F.3d at 559 ("The Supreme Court has allowed officers to seize incriminating evidence in plain view during the course of a lawful search . . . .").[12] Courts use a totality of the circumstances analysis to assess whether probable cause existed. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

Though the probable cause standard defies easy definition, *Illinois v. Gates*, 462 U.S. 213, 231–32 (1983), the totality of the circumstances indicate the police had probable cause to believe that (1) the refrigerator itself was evidence of the shooting and (2) the refrigerator may contain further evidence, such as projectiles, of the shooting. The police had been called to respond to a shooting at the rear and kitchen area of 185 Parker Street. In investigating, they found bullet holes in the refrigerator in the kitchen. Given the crime they were investigating (a shooting) and the location of the crime (the kitchen area), the police had probable cause to believe the bullet markings on the refrigerator were ballistic evidence of the crime, and that the interior refrigerator would

---

[12] This Court is not alone in applying the plain view doctrine to all evidence in plain view. *See United States v. Davis*, 690 F.3d 226, 237 (4th Cir. 2012) ("[A]n item need not itself be contraband before it has an 'incriminating nature,' but instead, an item need only be evidence of a crime."); *United States v. Smith*, 459 F.3d 1276, 1293 (11th Cir. 2006) ("[T]he scope of the 'plain view' doctrine extends to the seizure of items that, while not contraband themselves, may be used as evidence against a defendant.").

13

contain further evidence, in the form of projectiles or more bullet marks. Therefore, the police could lawfully seize the refrigerator without a warrant.

### d. *Plain View Search*

The Supreme Court has suggested that if the plain view doctrine supports seizure of an item, it also supports a search of the item. *Arizona v. Hicks*, 480 U.S. 321, 326 (1987) ("It would be absurd to say that an object could be lawfully seized and taken from the premises, but could not be moved for closer examination. It is clear, therefore, that the search here was valid if the 'plain view' doctrine would have sustained a seizure of the equipment.") Several Courts of Appeals have used this language to uphold warrantless searches of items found under the plain view exception. *See United States v. Lemus*, 582 F.3d 958, 965 (9th Cir. 2009) (upholding detective's lifting of couch cushion to confirm firearm underneath was illegal when butt of firearm was in plain view); *United States v. Banks*, 514 F.3d 769, 774–76 (8th Cir. 2008) (upholding warrantless search of black case containing a firearm that was discovered in plain view because police had probable cause to seize case); *United States v. Buchanan*, 70 F.3d 818, 825–26 (5th Cir. 1995) (upholding field test of narcotics as lawful warrantless search because officers could have seized narcotics under plain view doctrine); *Bradway v. Gonzales*, 26 F.3d 313, 320 (2d Cir. 1994) (upholding warrantless search of interior of camp stove discovered in plain view because immediately apparent it was stolen).

The refrigerator was seizable under the plain view doctrine because the police had probable cause to believe the appliance both was and contained incriminating evidence. Because the refrigerator was seizable, the detective could open the refrigerator to conduct

14

a "closer examination" of it. *Hicks*, 480 U.S. at 326. Therefore the detective was lawfully within the refrigerator when he seized the heroin.

e. *The "Outward Appearance" Doctrine*

Even if we were to decline to implement the rule described above, the detectives were justified in opening the refrigerator based on its outward appearance. This Court has determined that the outward appearance of certain containers may be so suggestive of their contents that the containers may be opened without a warrant. *Gov't of Virgin Islands v. Rasool*, 657 F.2d 582, 589–90 (3d Cir. 1981). The Courts of Appeals of several other Circuits have also adopted this rule. *Banks*, 514 F.3d at 773–74; *United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005); *United States v. Gust*, 405 F.3d 797, 800–802 (9th Cir. 2005); *United States v. Williams,* 41 F.3d 192, 197 (4th Cir. 1994); *United States v. Corral*, 970 F.2d 719, 725–26 (10th Cir. 1992); *United States v. Sylvester*, 848 F.2d 520, 525 (5th Cir. 1988); *United States v. Eschweiler*, 745 F.2d 435, 439–40 (7th Cir. 1984); *United States v. Bachner*, 706 F.2d 1121, 1126 n.7 (11th Cir. 1983).[13]

This rule, considered an extension of the plain view doctrine, applies when the contents of a container "can be inferred from the container's outward appearance." *Sylvester*, 848 F.2d at 525. Some courts refer to this as the "single-purpose container"

---

[13] These cases often draw support for the "outward appearance" exception from *Arkansas v. Sanders*, 442 U.S. 753 (1979), *overruled on other grounds by California v. Acevedo*, 500 U.S. 565 (1991), in which the Court stated, "[S]ome containers . . . by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." 442 U.S. at 764 n.13. *See Banks*, 514 F.3d at 773–74; *Meada*, 408 F.3d at 23; *Sylvester*, 848 F.2d at 525.

exception, and thus only apply it when the container could have only a single purpose, apparent from its outward appearance. *E.g.*, *Gust*, 405 F.3d at 801–02. Other courts, while still applying the exception narrowly, do not restrict its application to "single-purpose containers." For example, in *United States v. Williams*, the Court of Appeals for the Fourth Circuit used this doctrine to uphold the warrantless search of five packages "wrapped in cellophane with a brown opaque material inside." 41 F.3d at 197–98. In so doing, the court considered both the appearance of the container and the circumstances surrounding its discovery. *Id.* Though the Court of Appeals for the Ninth Circuit applies the doctrine narrowly, it determined that "the rationale behind the exception 'focuses upon the individual's reasonable expectation of privacy, which is established by general social norms.'" *Gust*, 405 F.3d at 801 (quoting *United States v. Miller*, 769 F.2d 554, 560 (9th Cir. 1985)).

Taking into consideration its appearance, the circumstances surrounding its discovery, *Williams*, 41 F.3d at 197–98, and the possessors' reasonable expectation of privacy, *Gust*, 405 F.3d at 801, the search of the refrigerator was justified. The outward appearance of the refrigerator in conjunction with the circumstances surrounding its viewing by the officers rendered it highly probable that incriminating evidence, in the form of bullets or bullet markings, would be found inside.[14] The police had been called

---

[14] Since the plain view doctrine applies to contraband and to incriminating evidence, *e.g.*, *Menon*, 24 F.3d at 559, and the "outward appearance exception" is merely one permutation of the plain view doctrine, *e.g.*, *Sylvester*, 848 F.2d at 524, we see no reason why the outward appearance exception should not apply when the container clearly contains incriminating evidence, as opposed to just contraband. *See United States v. Villarreal*, 963 F.2d 770, 776 (5th Cir. 1992) (citing *Horton*, 496 U.S. 128 ("The plain

16

to investigate a shooting at the rear of the house.  The refrigerator, located in the rear of the house, was riddled with bullet holes.  Therefore, it could be inferred from the appearance of the refrigerator that it contained incriminating evidence in the form of projectiles or interior markings from the shooting.  Additionally, since the occupants of the premises, Filpo and Sanchez, had called the police to investigate the shooting, their reasonable expectation of privacy in the bullet-riddled refrigerator was reduced.[15]  Thus the search of the refrigerator was justified, and appeal on the matter would be frivolous.

### 3. *Seizure of the Heroin*

Detective Gonzalez' seizure of the heroin was valid under the three-prong test for the plain view exception.  As explained above, under both the *Hicks* justification for a plain view search and the "outward appearance" exception, the detective was lawfully "within" the refrigerator, and he did not need to commit a further trespass to access the heroin.  From that vantage point, the heroin was in plain view.  Finally, it was

---

view exception is intended to allow police officers to seize *incriminating* items that they discover in the course of their legitimate law enforcement activities . . . .")) (emphasis in original); *see also Eschweiler*, 745 F.2d at 439-40 (upholding seizure and search of envelope for evidence under outward appearance exception).

[15] We are not taking the position that whenever an individual calls 911 regarding an emergency within her residence, she forfeits her expectation of privacy in the entire premises.  To do so would run afoul of *Thompson v. Louisiana*, 469 U.S. 17 (1984).  However, when an individual calls the police regarding a crime within her residence, and one of the individual's possessions in plain view contains obvious evidence of the crime, under the plain view doctrine she has a reduced expectation of privacy in that possession.  *Id.* at 18–19; *see also Horton* 496 U.S. at 141 ("As we have already suggested, by hypothesis the seizure of an object in plain view does not involve an intrusion on privacy."); *Illinois v. Andreas*, 463 U.S. 765, 771 (1983) ("The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy in that item is lost; the owner may retain the incidents of title and possession but not privacy.").

immediately apparent that the substance was contraband.  When he opened the refrigerator, the detective saw, in plain view, two clear containers which held marked glassine envelopes.  The detective knew that glassine envelopes are used to package heroin, and that such envelopes are stamped with markings, such as the ones on the envelopes he found, that indicate the "brand" of heroin contained therein.  Therefore, the seizure of the heroin in the refrigerator was valid under the plain view exception, and any attempt on appeal to challenge that seizure would be frivolous.

## C.  Remaining Claims

In addition to the suppression issue, Telfair raised three claims in his *pro se* filing, which Mr. Azzarello discussed in his brief.[16]  Mr. Azzarello also discussed two additional claims not raised by Telfair.  After reviewing these claims we find no nonfrivolous issues for appeal.

### 1.  *Ineffective Assistance of Counsel*

Telfair makes several arguments that could only be characterized as ineffective assistance of counsel claims.  Telfair alleges that trial counsel, Mr. Pedicini, failed to file pretrial motions, failed to call witnesses, and conspired with the Government to prevent an appeal.

---

[16] Aside from these three claims, which were addressed by Mr. Azzarello, Telfair raises numerous claims in which he alleges violations of Ms. Gatling's rights.  A defendant cannot seek suppression of evidence used against him at trial by claiming the Government violated a third party's rights. *Rakas v. Illinois*, 439 U.S. 128, 133 (1978); *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010).  Therefore, Telfair lacks standing to challenge the Government's treatment of Ms. Gatling, and so all of his claims regarding the alleged mistreatment of Ms. Gatling are frivolous.

Generally, we will not address ineffective assistance of counsel claims on direct appeal, and instead will defer such claims to collateral proceedings. *United States v. Thornton*, 327 F.3d 268, 271 (3d Cir. 2003). This is because an appellate court ruling on a direct appeal "'must proceed on a trial record not developed precisely for the object of litigating or preserving the [ineffectiveness] claim and thus often incomplete or inadequate for this purpose.'" *Id.* at 272 (quoting *Massaro v. United States*, 538 U.S. 500, 505 (2003)). In rare circumstances, the record on the ineffectiveness issue may be sufficiently developed for the matter to be resolved on direct appeal. *United States v. Cocivera*, 104 F.3d 566, 570–71 (3d Cir. 1996).

Here, though the record indicates Mr. Pedicini was not ineffective in many, if not all, aspects, we are not comfortable ruling on Telfair's claim at this time. The factual record is not sufficiently developed regarding Mr. Pedicini's failure to file pretrial motions or call witnesses on Telfair's behalf. [17] We do not have a sufficient record to decide these claims and so decline to do so.

---

[17] For a defendant to prevail on an ineffective assistance of counsel claim, he must establish that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel is deficient if counsel "made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Such deficiency prejudices the defendant when the errors were so serious as to undermine the trial process so that its results are not reliable. *Id.*

With regards to the "conspiracy" allegation, Mr. Pedicini was not ineffective. Telfair had filed a notice of appeal immediately after the trial verdict but before the imposition of a judgment and sentence. Mr. Pedicini wrote several letters explaining that the appeal was premature under Federal Rule of Appellate Procedure 4(b)(A). He explained he would consent to the Government's motion to dismiss without prejudice, and that Telfair could refiled after the sentence was imposed. Telfair views this as a conspiracy to deprive him of his right to appeal.

## 2. *Challenge to the Indictment*

Telfair alleges the second superseding indictment, the indictment upon which he was convicted, was deficient and that it contained embellished and misleading information.

To be sufficient, an indictment must charge every element of the offense. *United States v. Polan*, 970 F.2d 1280, 1282 (3d Cir. 1992). In count one, Telfair was charged with conspiring to violate 21 U.S.C. §§ 841(a), (b)(1)(A) in violation of 21 U.S.C. § 846. (Appendix ("App.") 72). The elements of this offense are: (1) knowingly and intentionally (2) conspiring to (3) distribute or possess with the intent to distribute (4) one kilogram or more of a mixture or substance containing a detectable amount of heroin. The indictment charged that Telfair "did knowingly and intentionally conspire and agree with others to distribute and possess with the intent to distribute 1 kilogram or more of heroin, a Schedule I controlled substance, contrary to Title 21, United States Code, Sections 841(a) and 841(b)(1)(A). In violation of Title 21, United States Code, Section 846." (App. 73). The indictment stated every element of the offense charged in count one.

Count two charged Telfair with violating 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2. The elements of this offense are: (1) knowingly and intentionally (2) distributing or possessing with intent to distribute (3) 100 grams or more of a mixture or substance containing a detectable amount of heroin. The indictment charged that Telfair "did knowingly and intentionally distribute and possess with intent to distribute 100

---

Mr. Pedicini's consent to the non-prejudicial dismissal of the appeal was not evidence of his ineffectiveness and it did not prejudice Telfair.

grams or more of heroin, a Schedule I controlled substance.  In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), and Title 18, United States Code, Section 2."  The indictment stated every element of the offense charged in count two.

Aside from the elements of the offenses, the only other details in the indictment were the dates and locations of the alleged violations.  Telfair's claim that the indictments contained embellished or misleading information is unfounded.

### 3. *Discovery Violations*

Telfair makes general allegations of discovery violations, but provides no specifics. Telfair's trial counsel, the Government, and the District Court continually reiterated there were no discovery violations.  Additionally, a thorough examination of the record shows defense counsel was not deprived of discovery.  Telfair also alleges defense counsel failed to share the discovery with Telfair.  This is an ineffective assistance of counsel claim, and as explained above, we will not rule on it at this juncture.

### 4. *Motions for Mistrial*

The next potential issue for appeal is whether the District Court erred in twice denying motions for a mistrial.[18]  We review a district court's denial of a mistral for abuse of discretion.  *United States v. Hakim*, 344 F.3d 324, 328 (3d Cir. 2003).

#### a. *The first motion for a mistrial*

Defense counsel first moved for a mistrial during the testimony of Carlos Jose Antigua, Carlito's brother.  Antigua testified he had received a call from Telfair's cell

---

[18] Mr. Azzarello raised this issue in his brief though Telfair did not discuss it in his *pro se* filings.  In the interest of thoroughness, we will review it.

21

phone, and that the person on the other end stated Telfair was not available because he was in jail for domestic violence. Defense counsel moved for a mistrial.

The person on the other end of the phone call was an undercover federal agent. He had told Mr. Antigua that Telfair was in jail for domestic violence because the Government was investigating the Antiguas for heroin distribution. Telfair had been a customer of the Antiguas, and the Government did not want to alert them to the possibility that Telfair had been caught, and so the Agent made up the domestic violence story to explain Telfair's absence.

Immediately after defense counsel's motion, the District Court held a sidebar conference, during which the Government confirmed it had not been expecting, and had not attempted to elicit, the testimony Antigua provided. The court determined the best remedy would be an immediate jury instruction:

> Ladies and gentlemen, you just heard the witness mention domestic violence. I want it to be clear that the Government's position, and they agree with defense that there are no allegations of any domestic violence; that that apparently was told to this witness as a ruse to let him know why the Defendant wasn't present. Nobody is suggesting that Telfair was involved in any domestic violence, and that's not a part of this case, so please don't let that enter into your deliberations at all. I think that answer came up even as somewhat of an unknown to the prosecutor. But that's what this witness was told, but not true.

(Tr. at 431). We presume the jury followed this curative instruction. *United States v. Lore*, 430 F.3d 190, 206 (3d Cir. 2005). The immediacy with which the trial judge issues the curative instruction is an important factor in determining whether the instructions have cured any prejudice. *United States v. Sotomayor-Vazquez*, 249 F.3d 1, 18 (1st Cir.

22

2001).  The stronger the evidence against the defendant, the more likely the erroneous admission of evidence may be cured.  *Cf. Marshall v. Hendricks*, 307 F.3d 36, 69 (3d Cir. 2002) ("[T]he stronger the evidence against the defendant, the more likely that improper arguments or conduct have not rendered the trial unfair . . . .")

The District Judge immediately addressed the improper testimony and issued the above curative instruction.  Without reciting the evidence against Telfair, the abundance of proof connecting Telfair with the heroin found at 185 Parker Street, as well as to the broader conspiracy, rendered the error a curable one.  The District Court's instruction alleviated any risk of prejudice.

b. *The second motion for a mistrial*

The second motion for a mistrial was made during summation arguments.  At the close of his argument, the Assistant U.S. Attorney said the following,

> So, ladies and gentlemen, when you consider what the weight of the evidence is, when you consider the defense tactics, nothing but distractions in this case, and cast them aside in your deliberations, the Government is confident that you will return the only verdict that can be reached based on the law and the evidence as you have seen, and we would ask you to find the Defendant, Telfair, guilty as charged on both counts of the indictment.

(Tr. At 636-37).  Defense counsel moved for a mistrial based on the Government's use of the word "tactics," saying it was unduly pejorative.  The District Court denied the motion.

To grant a mistrial based on summation arguments by the Government, the inquiry is "whether such remarks, in the context of the entire trial, were sufficiently prejudicial to

23

violate a defendant's due process rights." *United States v. Scarfo*, 685 F.2d 842, 849 (3d Cir. 1982). "[A]ttacks on the opposing advocate's arguments and tactics are acceptable, and indeed [] attacking and exposing flaws in one's opponent's arguments is a major purpose of closing argument." *United States v. Rivas*, 493 F.3d 131, 139 (3d Cir. 2007). In *Rivas*, this Court found no fault when the Government attorney stated it was defense counsel's "'job [] to take [the jury's] focus off the issue.'" *Id.* at 139–40. The challenged statement here is substantially similar to the one in *Rivas*. Given this similarity, and the lack of any prejudicial effect on Telfair, the District Court did not abuse its discretion in denying defense counsel's motion. Therefore, no nonfrivolous issues exist regarding the denial of defense counsel's motions for a mistrial.

## 5. *Sentencing*

The last potential issue is whether the sentencing process was flawed. We review imposition of a criminal sentence for abuse of discretion and conduct a two-step inquiry. *United States v. Wright*, 642 F.3d 148, 152 (3d Cir. 2011). We first review the proceedings to determine whether the District Court committed procedural error; if we find such error, we remand without further analysis. *Id.* If there is no procedural error, we review for substantive reasonableness, and affirm "unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Id.* (citations and internal quotation marks omitted).

The District Court must follow a three step sentencing process: (1) the court must calculate the Guidelines range, including sentencing enhancements; (2) the court must consider any motions for departure; and (3) the court must consider the Guidelines range

in conjunction with the sentencing factors listed in 18 U.S.C. § 3553(a) to determine the appropriate sentence. *Id.*

The District Court followed the requisite procedure. At the outset of the sentencing hearing, the court explained the three step procedure and structured the hearing pursuant to that process. The court correctly calculated the offense level at thirty-seven and Telfair's criminal history category at six, resulting in a Guidelines range of 360 months to life imprisonment. Neither party moved for a departure, so the court proceeded to step three. The District Court heard both parties' arguments for an appropriate sentence in light of the § 3553(a) factors. After taking into consideration the § 3553(a) factors, the District Court imposed a sentence of 240 months' imprisonment. There were no errors in the process.

The sentence was not substantively unreasonable. Noting that Telfair barely satisfied the requirements to be considered a Career Offender under the Guidelines, the court expressed concern that the Guidelines sentence was overly harsh. The court also considered the sentences imposed on other individuals who had been convicted for involvement in the same conspiracy as Telfair. In light of this, the District Court concluded a downward variance from the Guidelines was appropriate. This was not unreasonable, and therefore no nonfrivolous grounds for appeal arose during sentencing.

## IV.

For the foregoing reasons, we grant counsel's motion to withdraw and affirm Defendant's conviction and sentence. We have also reviewed the various *pro se* requests and motions filed by Telfair and these are denied as being without merit.

25